BALL ET AL. *v.* JAMES ET AL.

No. 79-1740.  Argued February 23, 1981—Decided April 29, 1981

356

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and POWELL, REHNQUIST, and STEVENS, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 372. WHITE, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, *post*, p. 374.

*Rex E. Lee* argued the cause for appellants. With him on the briefs were *Jon L. Kyl* and *Neil Vincent Wake.*

*Bruce Meyerson* argued the cause for appellees. With him on the brief was *Amy J. Gittler.**

---

*Noel Fidel* filed a brief for the Arizona Civil Liberties Union et al. as *amici curiae* urging affirmance.

JUSTICE STEWART delivered the opinion of the Court.

This appeal concerns the constitutionality of the system for electing the directors of a large water reclamation district in Arizona, a system which, in essence, limits voting eligibility to landowners and apportions voting power according to the amount of land a voter owns. The case requires us to consider whether the peculiarly narrow function of this local governmental body and the special relationship of one class of citizens to that body releases it from the strict demands of the one-person, one-vote principle of the Equal Protection Clause of the Fourteenth Amendment.

# I

The public entity at issue here is the Salt River Project Agricultural Improvement and Power District, which stores and delivers untreated water to the owners of land comprising 236,000 acres in central Arizona.[1] The District, formed as a governmental entity in 1937, subsidizes its water operations by selling electricity, and has become the supplier of electric power for hundreds of thousands of people in an area including a large part of metropolitan Phoenix. Nevertheless, the history of the District began in the efforts of Arizona farmers in the 19th century to irrigate the arid lands of the Salt River Valley, and, as the parties have stipulated, the primary purposes of the District have always been the storage, delivery, and conservation of water.

As early as 1867, farmers in the Salt River Valley attempted to irrigate their lands with water from the Salt River. In 1895, concerned with the erratic and unreliable flow of the river, they formed a "Farmers Protective Association," which helped persuade Congress to pass the Reclamation Act of 1902, 32 Stat. 388, 43 U. S. C. § 371 *et seq.* Under

---

[1] The review in this opinion of the history, organization, functions, and financing of the District is drawn from the stipulation of facts in the District Court.

that Act, the United States gave interest-free loans to help landowners build reclamation projects. The Salt River Project, from which the District developed, was created in 1903 as a result of this legislation. In 1906, Congress authorized projects created under the Act to generate and sell hydroelectric power, 43 U. S. C. § 522, and the Salt River Project has supported its water operations by this means almost since its creation. The 1902 Act provided that the water users who benefited from the reclamation project had to agree to repay to the United States the costs of constructing the project, and the Salt River Valley Water Users Association was organized as an Arizona corporation in 1903 to serve as the contracting agent for the landowners. The Association's Articles, drafted in cooperation with the Federal Reclamation Service, gave subscribing landowners the right to reclamation water and the power to vote in Association decisions in proportion to the number of acres the subscribers owned. The Articles also authorized acreage-proportionate stock assessments to raise income for the Association, the assessments becoming a lien on the subscribing owners' land until paid. For almost 15 years, the Federal Reclamation Service operated and maintained the project's irrigation system for the landowners; under a 1917 contract with the United States, however, the Association itself took on these tasks, proceeding to manage the project for the next 20 years.

The Association faced serious financial difficulties during the Depression as it built new dams and other works for the project, and it sought a means of borrowing money that would not overly encumber the subscribers' lands. The means seemed to be available in Arizona's Agricultural Improvement District Act of 1922, which authorized the creation of special public water districts within federal reclamation projects. Ariz. Rev. Code of 1928, § 3467 *et seq.* Such districts, as political subdivisions of the State, could issue bonds exempt from federal income tax. Nevertheless, many Association members opposed creating a special district for

the project, in part because the state statute would have required that voting power in elections for directors of the district be distributed per capita among landowners, and not according to the acreage formula for stock assessments and water rights. In 1936, in response to a request from the Association, the state legislature amended the 1922 statute. Under the new statutory scheme, which is essentially the one at issue in this case, the legislature allowed the district to limit voting for its directors to voters, otherwise regularly qualified under state law, who own land within the district, and to apportion voting power among those landowners according to the number of acres owned. Ariz. Rev. Stat. Ann. §§ 45–909, 45–983 (Supp. 1980–1981).[2] The Salt River Project Agricultural Improvement and Power District was then formed in 1937, its boundaries essentially the same as the Association's. Under the 1937 agreement, the Association made the District its contracting agent, and transferred to the District all its property, and the Association in turn agreed to continue to operate and maintain the Salt River Project. Under the current agreement, the District itself manages the power and water storage work of the project, and the Association, as agent for the District, manages water delivery. As for financing, the statute now permits the special districts to

---

[2] In recent years, the method of electing the Board of Directors has departed somewhat from the strict one-acre, one-vote system originally used by the Association and the District. In 1969 the state legislature amended the Agricultural Improvement Act to permit owners of less than one acre to cast fractional votes in proportion to their acreage. Ariz. Rev. Stat. Ann. § 45–983C (Supp. 1980–1981). A second change had to do with the membership of the Board of Directors itself. Before 1976, there were 10 directors, each elected from a designated geographical part of the District. In 1976, after the District Court had dismissed the complaint in this case, the state legislature enlarged the Board to 14 members and provided that the 4 new members were to be elected at large, with each landowner in the District having one vote in the at-large election. Ariz. Rev. Stat. Ann. §§ 45–961B, 45–963 (Supp. 1980–1981). Each special water district also has a President and Vice President, elected at large on an acreage-weighted basis. § 45–963.

raise money through an acreage-proportionate taxing power that mirrors the Association's stock assessment scheme, Ariz. Rev. Stat. Ann. §§ 45–1014, 45–1015 (1956), or through bonds secured by liens on the real property within the District, though the bonds can simultaneously be secured by District revenues, Ariz. Rev. Stat. Ann. § 45–936 (Supp. 1980–1981).

## II

This lawsuit was brought by a class of registered voters who live within the geographic boundaries of the District, and who own either no land or less than an acre of land within the District. The complaint alleged that the District enjoys such governmental powers as the power to condemn land, to sell tax-exempt bonds, and to levy taxes on real property. It also alleged that because the District sells electricity to virtually half the population of Arizona, and because, through its water operations, it can exercise significant influence on flood control and environmental management within its boundaries, the District's policies and actions have a substantial effect on all people who live within the District, regardless of property ownership. Seeking declaratory and injunctive relief, the appellees claimed that the acreage-based scheme for electing directors of the District violates the Equal Protection Clause of the Fourteenth Amendment.

On cross-motions for summary judgment and on stipulated facts, the District Court for the District of Arizona held the District voting scheme constitutional and dismissed the complaint. A divided panel of the Court of Appeals for the Ninth Circuit reversed. 613 F. 2d 180. Noting this Court's repeated application of the one-person, one-vote principle established in *Reynolds* v. *Sims*, 377 U. S. 533, the Court of Appeals turned its attention to the case in which this Court marked a significant exception to that principle by upholding a state law permitting only landowners to vote in the election of directors of a water district: *Salyer Land Co.* v. *Tulare Lake Basin Water Storage District*, 410 U. S. 719. The deci-

sion in *Salyer* resulted from this Court's examination of the nature of the services provided by the water district in that case, and its conclusion that "by reason of its special limited purpose and of the disproportionate effect of its activities on landowners as a group," the water district there was not subject to the strict one-person, one-vote demands of the *Reynolds* decision. 410 U. S., at 728. Accordingly, the Court of Appeals considered the constitutionality of the Salt River District's electoral system by comparing the purposes and effects of the activities of the Salt River District with those of the Tulare Lake Basin Water Storage District.

The Court of Appeals stressed that the water district in *Salyer* covered a sparsely populated area of wholly agricultural land. 613 F. 2d, at 183. It also noted that the primary function of the Tulare Lake Basin Water Storage District had remained the storage and delivery of water for agriculture, and that the district did not provide such other general public services as utilities. *Ibid.* Finally, the Court of Appeals pointed out that the income for the district in *Salyer* came completely from assessments against the landowners. 613 F. 2d, at 183. The Court of Appeals found the Salt River District, at least in its modern form, very different. It pointed out that the Salt River District is a major generator and supplier of hydroelectric power in the State, and that roughly 40% of the water it delivers goes to urban areas for nonagricultural uses. *Id.*, at 183–184. The court therefore concluded that the Salt River District does not serve the sort of special, narrow purpose that proved decisive in *Salyer*. 613 F. 2d, at 183–184. Moreover, though it recognized that the District has $290 million of general obligation bonds outstanding that are secured by a lien on lands owned by the voting members, the Court of Appeals found it significant that all the general obligation bonds have so far been serviced out of the District's electricity revenues, and that all capital improvements have been financed by revenue bonds, which have been issued in the amount of $600 million, and

which are junior to the general obligation bonds. *Id.*, at 184. The court thus concluded that the actual financial burden of running the District has not fallen primarily on the voting landowners, and therefore that the activities of this water district, unlike those of the district in *Salyer*, do not disproportionately affect landowners as such. 613 F. 2d, at 184–185.[3]

The Court of Appeals was correct in conceiving the question in this case to be whether the purpose of the District is sufficiently specialized and narrow and whether its activities bear on landowners so disproportionately as to distinguish the District from those public entities whose more general governmental functions demand application of the *Reynolds* principle. We conclude, however, that, in its efforts to distinguish *Salyer* the Court of Appeals did not apply these criteria correctly to the facts of this case.

## III

*Reynolds* v. *Sims, supra,* held that the Equal Protection Clause requires adherence to the principle of one-person, one-vote in elections of state legislators. *Avery* v. *Midland County,* 390 U. S. 474, extended the *Reynolds* rule to the election of officials of a county government, holding that the elected officials exercised "general governmental powers over

---

[3] In holding that the one-person, one-vote principle of *Reynolds* applies to the Salt River District, the Court of Appeals stressed the scope of the District's power operations and the diversity of its water operations, and rejected the appellees' argument that the power operations are essentially business activities incidental to the District's narrow primary purpose of storing and delivering water: "[T]he scale of the District's operations simply does not permit the interpretation that the electric utility is a side venture that the District dabbles in to pick up a little extra money in order to benefit the landowners. The operation of the utility has taken on independent significance. . . . The electric utility operations of the District are so substantial in scope and are so closely interwoven with the water delivery functions of the District that it is not a special limited purpose district whose operations have a disproportionate effect on landowners as a class." 613 F. 2d, at 184–185.

the entire geographic area served by the body." 390 U. S., at 485.[4] The Court, however, reserved any decision on the application of *Reynolds* to "a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents." 390 U. S., at 483–484.[5] In *Hadley* v. *Junior College District,* 397 U. S. 50, the Court extended *Reynolds* to the election of trustees of a community college district because those trustees "exercised general governmental powers" and "perform[ed] important governmental functions" that had significant effect on all citizens residing within the district. 397 U. S., at 53–54. But in that case the Court stated: "It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds* . . . might not be required . . . ." *Id.,* at 56.[6]

The Court found such a case in *Salyer.* The Tulare Lake Basin Water Storage District involved there encompassed 193,000 acres, 85% of which were farmed by one or another of four corporations. *Salyer Land Co.* v. *Tulare Lake Basin Water Storage District,* 410 U. S., at 723. Under California law, public water districts could acquire, store, conserve, and distribute water, and though the Tulare Lake Basin Water

---

[4] Among the duties of the County Commissioners Court in *Avery* were establishing courthouses and jails, appointing health officials, building roads and bridges, administering welfare, setting the county tax rate, adopting the county budget, and equalizing tax assessments. 390 U. S. at 476.

[5] "[T]he Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems." *Id.,* at 485.

[6] The Court held that the Junior College District in *Hadley* did not fall within this exception because "[e]ducation has traditionally been a vital governmental function, and these . . . are governmental officials in every relevant sense of that term." 397 U. S., at 56.

Storage District had never chosen to do so, could generate and sell any form of power it saw fit to support its water operations. *Id.*, at 723–724. The costs of the project were assessed against each landowner according to the water benefits the landowner received. *Id.*, at 724. At issue in the case was the constitutionality of the scheme for electing the directors of the district, under which only landowners could vote, and voting power was apportioned according to the assessed valuation of the voting landowner's property. The Court recognized that the Tulare Lake Basin Water Storage District did exercise "some typical governmental powers," including the power to hire and fire workers, contract for construction of projects, condemn private property, and issue general obligation bonds. *Id.*, at 728, and n. 7. Nevertheless, the Court concluded that the district had "relatively limited authority," because "its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin." *Id.*, at 728 (footnote omitted). The Court also noted that the financial burdens of the district could not but fall on the landowners, in proportion to the benefits they received from the district, and that the district's actions therefore disproportionately affected the voting landowners. *Id.*, at 729.[7] The *Salyer* Court thus held that the strictures of *Reynolds* did not apply to the Tulare District, and proceeded to inquire simply whether the statutory voting scheme based on land valuation at least bore some relevancy to the statute's objectives.[8]

---

[7] On the same day it decided *Salyer*, the Court upheld a similar scheme in Wyoming, under which the voters in a referendum on the creation of a water district had to be landowners, and in which the decision to create the district required the votes of landowners representing a majority of the acreage of the lands within the proposed district. *Associated Enterprises, Inc.* v. *Toltec Watershed Improvement Dist.*, 410 U. S. 743 (*per curiam*).

[8] In *Kramer* v. *Union Free School District No. 15*, 395 U. S. 621, 627, the Court stated that the exclusion of otherwise qualified voters from a par-

The Court concluded that the California Legislature could have reasonably assumed that without voting power apportioned according to the value of their land, the landowners might not have been willing to subject their lands to the lien of the very assessments which made the creation of the district possible. 410 U. S., at 731.

As noted by the Court of Appeals, the services currently provided by the Salt River District are more diverse and affect far more people than those of the Tulare Lake Basin Water Storage District. Whereas the Tulare District included an area entirely devoted to agriculture and populated by only 77 persons, the Salt River District includes almost half the population of the State, including large parts of Phoenix and other cities. Moreover, the Salt River District, unlike the Tulare District, has exercised its statutory power to generate and sell electric power, and has become one of the largest suppliers of such power in the State. Further, whereas all the water delivered by the Tulare District went for agriculture, roughly 40% of the water delivered by the Salt River District goes to urban areas or is used for nonagricultural purposes in farming areas.[9] Finally whereas all operating costs of the Tulare District were born by the voting landowners through assessments apportioned according to land value, most of the capital and operating costs of the Salt River District have been met through the revenues gen-

---

ticular election must be justified by some compelling state interest. But in considering whether the voting scheme for the Tulare Lake Basin Water Storage District bore some relevancy to the purpose for which the scheme was adopted, *Salyer* imposed no such requirement.

[9] Approximately 15% of the water delivered by the District is used in farming areas for nonagricultural irrigation purposes such as schools, playgrounds, and parks. Another 25% is delivered to municipalities. Of the latter, some belongs to the municipalities themselves as landowners, and some belongs to landowning city residents who have chosen the cities as their receiving agents.

erated by the selling of electric power.[10]    Nevertheless, a careful examination of the Salt River District reveals that, under the principles of the *Avery, Hadley,* and *Salyer* cases, these distinctions do not amount to a constitutional difference.

First, the District simply does not exercise the sort of governmental powers that invoke the strict demands of *Reynolds.* The District cannot impose ad valorem property taxes or sales taxes.   It cannot enact any laws governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services.[11]

---

[10] As the Court of Appeals noted, the District has $290 million of general obligation bonds outstanding that are secured by the statutory lien on District lands, but the bonds have been serviced entirely out of the District's power earnings, and since 1973 all borrowing for capital improvements has been secured by pledges of revenues.   The District now has outstanding $600 million of these revenue bonds, which are junior to the general obligation bonds.   The voting landowners have also committed some capital to the Salt River Project, through stock assessments charged by the Association, but the Association last exercised its assessment power in 1951.

[11] In *Salyer,* we recognized that the powers to contract for and staff projects, to condemn property, and to issue bonds do not amount to such general governmental authority.   410 U. S., at 728, n. 8.   And as recognized by the dissenting opinion in the companion case to *Salyer,* the power to levy and collect special assessments also does not create such general governmental authority.   *Associated Enterprises, Inc.* v. *Toltec Watershed Improvement Dist., supra,* at 749 (Douglas, J.).

In other cases, the Court has found invalid state laws tying voting eligibility to property ownership in elections to approve issuance of bonds to finance a city library, *Hill* v. *Stone,* 421 U. S. 289, and a municipal utility, *Cipriano* v. *City of Houma,* 395 U. S. 701 (*per curiam*), and to issue general obligation bonds secured by a lien on real property, *Phoenix* v. *Kolodziejski,* 399 U. S. 204.   In those cases, however, the elections concerned the operations of traditional municipalities exercising the full range of normal governmental powers, and so the cases do not bear on the question of a special-purpose governmental entity like the

Second, though they were characterized broadly by the Court of Appeals, even the District's water functions, which constitute the primary and originating purpose of the District, are relatively narrow. The District and Association do not own, sell, or buy water, nor do they control the use of any water they have delivered. The District simply stores water behind its dams, conserves it from loss, and delivers it through project canals.[12] It is true, as the Court of Appeals noted, that as much as 40% of the water delivered by the District goes for nonagricultural purposes. But the distinction between agricultural and urban land is of no special constitutional significance in this context. The constitutionally relevant fact is that all water delivered by the Salt River District, like the water delivered by the Tulare Lake Basin Water Storage District, is distributed according to land ownership,[13] and the District does not and cannot control the use to

Salt River District. See *Salyer Land Co.* v. *Tulare Lake Basin Water Storage District,* 410 U. S., at 727.

[12] The appellees have alleged that the District's power over flood control affects all residents within District boundaries and therefore represents the sort of important governmental function that invokes the *Reynolds* one-person, one-vote doctrine. However, as we held in *Salyer,* where such a power over flood control is incidental to a District's primary water functions, it is not of decisive constitutional significance. 410 U. S., at 728, n. 8. Indeed, in both the *Salyer* and *Associated Enterprises, Inc.,* cases, control of erosion and flooding was one of the express statutory purposes of the water districts; the Salt River District has no such express statutory power, and so any influence it exerts over flood control is simply an effect of the exercise of its more limited statutory water functions.

[13] The Court of Appeals slightly misconstrued the facts in stating that a significant portion of water delivered by the District "is used and paid for in a manner unrelated to agriculture *or land ownership.*" 613 F. 2d, at 184 (emphasis added). Though some landowning city residents have designated their cities as contracting agents to receive their water allotments, see n. 9, *supra,* the stipulated facts show that all entitlement to water · in the District derives from land ownership, whether rights to surface water appurtenant to land or acreage-based entitlements to stored water.

which the landowners who are entitled to the water choose to put it. As repeatedly recognized by the Arizona courts, though the state legislature has allowed water districts to become nominal public entities in order to obtain inexpensive bond financing, the districts remain essentially business enterprises, created by and chiefly benefiting a specific group of landowners. *Niedner* v. *Salt River Project Agricultural Improvement and Power Dist.*, 121 Ariz. 331, 590 P. 2d 447; *Uhlmann* v. *Wren*, 97 Ariz. 366, 374, 401 P. 2d 113, 124; *Local 266, I. B. E. W.* v. *Salt River Project Agricultural Improvement and Power Dist.*, 78 Ariz. 30, 41–42, 275 P. 2d 393, 402. As in *Salyer*, the nominal public character of such an entity cannot transform it into the type of governmental body for which the Fourteenth Amendment demands a one-person, one-vote system of election.[14]

Finally, neither the existence nor size of the District's power business affects the legality of its property-based voting scheme. As this Court has noted in a different context, the provision of electricity is not a traditional element of governmental sovereignty, *Jackson* v. *Metropolitan Edison Co.*, 419 U. S. 345, 353, and so is not in itself the sort of general or important governmental function that would make the government provider subject to the doctrine of the *Reynolds* case.[15] In any event, since the electric power functions were stipulated to be incidental to the water functions which are the District's primary purpose, they cannot change

[14] Significantly, though the District's nominal status as a governmental body technically exempts it from state taxes, it makes ad valorem contributions to the state treasury according to the same formula by which the State's private utilities pay property taxes. Ariz. Rev. Stat. Ann. § 45–2201 *et seq.* (Supp. 1980–1981).

[15] The Tulare Lake Basin Water Storage District in *Salyer* had the statutory power to generate and sell electricity at any time and in any manner, 410 U. S., at 724, but that fact did not alter the Court's view that the district's purpose was too narrow to invoke the *Reynolds* principle.

the character of that enterprise.[16]   The Arizona Legislature permitted the District to generate and sell electricity to subsidize the water operations, which were the beneficiaries intended by the statute.[17]   A key part of the *Salyer* decision was that the voting scheme for a public entity like a water district may constitutionally reflect the narrow primary purpose for which the district is created.   In this case, the parties have stipulated that the primary legislative purpose of the District is to store, conserve, and deliver water for use by District landowners, that the sole legislative reason for making water projects public entities was to enable them to raise revenue through interest-free bonds, and that the development and sale of electric power was undertaken not for the primary purpose of providing electricity to the public, but "to support the primary irrigation functions by supplying power for reclamation uses and by providing revenues which could be applied to increase the amount and reduce the cost of water to Association subscribed lands."

The appellees claim, and the Court of Appeals agreed, that the sheer size of the power operations and the great

---

[16] The stipulated facts show that, measured as a percentage of gross-power revenues, the amount of District revenues used to support the water operations is roughly equal to the sum of the dividends paid to common stockholders in a comparable private electric utility.

[17] As stated by the Arizona Supreme Court:

"Most municipal corporations are owned by the public and managed by public officials. . . .   Such is not the case here. . . .   The public does not own the District.   The governmental entity such as a city or town does not manage or benefit from the profits of this District.   Instead, the owners are private landholders.   The profits from the sale of electricity are used to defray the expense in irrigating these private lands for personal profit.   The public interest is merely that of consumers of its product, for which they pay. . . .   The District does not function to 'serve the whole people' but rather the District operates for the benefit of these 'inhabitants of the district' who are private owners." *Local 266, I. B. E. W.* v. *Salt River Agricultural Improvement and Power Dist.*, 78 Ariz. 30, 44, 275 P. 2d 393, 402–403.

370

number of people they affect serve to transform the District into an entity of general governmental power. But no matter how great the number of nonvoting residents buying electricity from the District, the relationship between them and the District's power operations is essentially that between consumers and a business enterprise from which they buy.[18] Nothing in the *Avery, Hadley,* or *Salyer* cases suggests that the volume of business or the breadth of economic effect of a venture undertaken by a government entity as an incident of its narrow and primary governmental public function can, of its own weight, subject the entity to the one-person, one-vote requirements of the *Reynolds* case.

The functions of the Salt River District are therefore of the narrow, special sort which justifies a departure from the popular-election requirement of the *Reynolds* case. And as in *Salyer,* an aspect of that limited purpose is the disproportionate relationship the District's functions bear to the specific class of people whom the system makes eligible to vote. The voting landowners are the only residents of the District whose lands are subject to liens to secure District bonds. Only these landowners are subject to the acreage-based taxing power of the District, and voting landowners are the only residents who have ever committed capital to the District through stock assessments charged by the Association.[19]

[18] Indeed, this consumer-business relationship is somewhat obscured by the appellees' claim of standing. The stipulated facts show that the District delivers 15% of its electric power to customers outside the District boundaries, and that 15% of lands within the District receive electricity from a private utility, rather than the District. Thus, if the appellees' claim of a constitutional right to vote for directors of the District rests on their relationship to the power functions of the District, they represent the wrong class of putative voters.

[19] The Court of Appeals found it significant that 98% of the District's revenues come from sales of electricity, and only 2% from charges assessed for water deliveries. 613 F. 2d., at 184. This fact in no way affects the constitutionality of the voting scheme. When the consumers of electricity

The *Salyer* opinion did not say that the selected class of voters for a special public entity must be the only parties at all affected by the operations of the entity, or that their entire economic well-being must depend on that entity. Rather, the question was whether the effect of the entity's operations on them was disproportionately greater than the effect on those seeking the vote.[20]

As in the *Salyer* case, we conclude that the voting scheme for the District is constitutional because it bears a reasonable relationship to its statutory objectives. Here, according to the stipulation of the parties, the subscriptions of land which made the Association and then the District possible might well have never occurred had not the subscribing landowners been assured a special voice in the conduct of the District's business. Therefore, as in *Salyer*, the State could rationally limit the vote to landowners. Moreover, Arizona could rationally make the weight of their vote dependent upon the number of acres they own, since that number reasonably reflects the relative risks they incurred as landowners and the distribution of the benefits and the burdens of the District's water operations.[21]

---

supply those power revenues, they are simply buying electricity; they are neither committing capital to the District nor committing any of their property as security for the credit of the District.

[20] The appellees, of course, are qualified voters in Arizona and so remain equal participants in the election of the state legislators who created and have the power to change the District.

[21] It in no way upsets the rationality of this scheme that the 40% of District acreage owned by corporations and municipalities is not voted at all. The lands owned by the corporations and cities are exclusively streets, alleys, canal rights of way, and the bed of the Salt River. Moreover, those lands are not subject to the District's acreage-based taxing power. Finally, it can hardly be said that the legislature acted irrationally in limiting voting eligibility to landowners who were otherwise qualified electors under state law.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE POWELL, concurring.

I concur fully in the Court's opinion, and write separately only to emphasize the importance to my decision of the Arizona Legislature's control over voting requirements for the Salt River District.

The Court previously has held that when a governmental entity exercises functions that are removed from the core duties of government and disproportionately affect a particular group of citizens, that group may exercise more immediate control over the management of the entity than their numbers would dictate. *Salyer Land Co.* v. *Tulare Lake Basin Water Storage District,* 410 U. S. 719 (1973). See *Hadley* v. *Junior College District,* 397 U. S. 50, 56 (1970); *Avery* v. *Midland County,* 390 U. S. 474, 483–484 (1968). This rule is consistent with the principle of "one person, one vote" applicable to the elections of bodies that exercise general governmental powers. *Reynolds* v. *Sims,* 377 U. S. 533 (1964). The Salt River District is a governmental entity only in the limited sense that the State has empowered it to deal with particular problems of resource and service management. The District does not exercise the crucial powers of sovereignty typical of a general purpose unit of government, such as a State, county, or municipality.[1]

---

[1] The Court has held that school boards must be elected on a strictly majoritarian basis. *Hadley* v. *Junior College District,* 397 U. S. 50 (1970); *Kramer* v. *Union Free School District No. 15,* 395 U. S. 621 (1969). These cases reflect the Court's judgment as to the unique importance of education among the functions of modern local government. See *Brown* v. *Board of Education,* 347 U. S. 483, 493 (1954). Cf. *Holt Civic Club* v. *Tuscaloosa,* 439 U. S. 60 (1978) (nonresidents may be subject to

Our cases have recognized the necessity of permitting experimentation with political structures to meet the often novel problems confronting local communities. *E. g., Holt Civic Club* v. *Tuscaloosa,* 439 U. S. 60, 71–72 (1978). As this case illustrates, it may be difficult to decide when experimentation and political compromise have resulted in an impermissible delegation of those governmental powers that generally affect all of the people to a body with a selective electorate. But state legislatures, responsive to the interests of all the people, normally are better qualified to make this judgment than federal courts.[2] Given the broad reforms effected by *Reynolds* v. *Sims,* we should expect that a legislature elected on the rule of one person, one vote will be vigilant to prevent undue concentration of power in the hands of undemocratic bodies. The absence of just such a political safeguard was a major justification for the Court's role in requiring legislative reapportionment. See *Baker* v. *Carr,* 369 U. S. 186, 258–259 (1962) (Clark, J., concurring).

The Court's opinion convincingly demonstrates that the powers exercised by the Salt River District are not powers that always must be exercised by a popularly elected body. *Ante,* at 366–371. Both storage and delivery of water are functions that in other areas of the Nation are performed by private or administrative bodies. These tasks sometimes are performed by an elected government entity, because of the aridity of the Southwest, federal water policy, and the his-

---

"police jurisdiction" of neighboring city without being constitutionally entitled to vote in the city).

[2] The Court deprecated the significance of control of voting requirements for a special-purpose election by a fairly elected legislature in *Kramer, supra,* at 628. See also *Avery* v. *Midland County,* 390 U. S. 474, 481, n. 6 (1968). The holding in *Kramer* is affected neither by *Salyer* nor by the decision of the Court today, see n. 1, *supra,* but it must be evident that some of the reasoning in that case has been questioned. See, *e. g., ante,* at 364–365, n. 8.

torical interest of Arizona landowners in irrigation, not because of their inherent character nor an insistent demand that the people as a whole decide how much water each will receive or how much each will pay for electricity.

Appellees argue that control of water is of prime importance in the Southwest and that many people purchase electricity from the District. These observations raise the question whether this Court should interfere with the constitution of the District, but do not answer it. The Arizona Legislature recently has demonstrated its control over the electoral processes of the District. It has reformed the District to increase the political voice of the small householder at the expense of the large landholder. *Ante,* at 359, n. 2. This reform no doubt reflects political and demographic changes in Arizona since the District was established.

The authority and will of the Arizona Legislature to control the electoral composition of the District are decisive for me in this case. The District is large enough and the resources it manages are basic enough that the people will act through their elected legislature when further changes in the governance of the District are warranted. We should allow the political process to operate. For this Court to dictate how the Board of the District must be elected would detract from the democratic process we profess to protect.

JUSTICE WHITE, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting.

In concluding that the District's "one-acre, one-vote" scheme is constitutional, the Court misapplies the limited exception recognized in *Salyer Land Co.* v. *Tulare Lake Basin Water Storage District,* 410 U. S. 719 (1973), on the strained logic that the provision of water and electricity to several hundred thousand citizens is a "peculiarly narrow function." Because the Court misreads our prior cases and its opinion is conceptually unsound, I dissent.

## I

The right to vote is of special importance because the franchise acts to preserve "other basic civil . . . rights." *Reynolds* v. *Sims,* 377 U. S. 533, 562 (1964). It is presumed that "when all citizens are affected in important ways by a governmental decision," the Fourteenth Amendment "does not permit . . . the exclusion of otherwise qualified citizens from the franchise." *Phoenix* v. *Kolodziejski,* 399 U. S. 204, 209 (1970). Any state statute granting the franchise to residents on a selective basis poses the "danger of denying some citizens any effective voice in the governmental affairs which substantially affect their lives." *Kramer* v. *Union Free School District No. 15,* 395 U. S. 621, 627 (1969).[1] See *Avery* v. *Midland County,* 390 U. S. 474 (1968). As a result, any classification restricting the franchise, except those involving residence, age, or citizenship, is unconstitutional "unless the district or State can demonstrate that the classification serves a compelling state interest." *Hill* v. *Stone,* 421 U. S. 289, 297 (1975). See *Kramer, supra,* at 626–627; *Phoenix, supra,* at 209 (giving power to property owners alone "can be justified only by some overriding interest of those owners that the State is entitled to recognize").

This fundamental principle has been applied in a variety of contexts to invalidate discriminatory election schemes limiting the franchise, in whole or in part, to property owners. In *Kramer,* the Court found invidious a system for local school district elections which limited eligibility to those who either (1) owned or leased taxable realty in the locality; or (2) were parents or custodians of children enrolled in the local public

---

[1] States, of course, have substantial latitude in structuring local government, and nonlegislative positions need not be elected at all. *Kramer* v. *Union Free School District No. 15,* 395 U. S., at 629. But once a State provides for elections, the Fourteenth Amendment requires that any discriminations be scrutinized under the principles enunciated in *Kramer* and its progeny.

schools. In *Cipriano* v. *City of Houma*, 395 U. S. 701 (1969), a case with particular relevance to the present action, the Court invalidated a state law which limited participation in a bond election for the support of a municipal utility system to property holders. The revenue bonds, secured by funds generated by the utility system itself, did not create any enforceable lien against any property in the city. *Id.*, at 705. Noting that the impact fell on property and nonproperty owners alike since all persons "use the utilities and pay the rates," the Court rejected the voting classification scheme disenfranchising nonproperty owners. Nor may the vote be limited to property owners in bond issuance elections with respect to general obligation bonds secured by property tax revenues. *Phoenix, supra,* at 209–213. See also *Police Jury of Parish of Vermilion* v. *Hebert,* 404 U. S. 807 (1971), summarily rev'g 258 La. 41, 245 So. 2d 349 (cannot limit vote for road improvement bonds to property holders). The Court has thus rejected the view that simply because property is directly burdened because of some governmental action, that fact alone justifies limiting the franchise to property owners where nonowners are also substantially affected. *Hill, supra,* at 299.

To be sure, the Court approved limiting the vote to landowners in electing the board of directors of a Water Storage District in *Salyer Land Co.* v. *Tulare Lake Basin Water Storage District.*[2] See *Associated Enterprises, Inc.* v. *Toltec*

---

[2] The possibility of departing from the one-person, one-vote logic of *Reynolds* in the case of special-purpose districts was suggested in *Avery* v. *Midland County,* 390 U. S. 474 (1968). But the Court left open the question whether a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents "may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions." *Id.,* at 483–484. Thus, even assuming that the landowners are more directly affected, *Avery* suggests that there may be situations where total exclusion is unconstitutional, but where the exact one-person, one-

*Watershed Improvement District,* 410 U. S. 743 (1973). But nothing in *Salyer* changed the relevant constitutional inquiry. Rather, the Court held the *Reynolds-Avery-Kramer* line of cases inapplicable to the water district because of its "special limited purpose *and* the disproportionate effect of its activities on landowners as a group . . . ." 410 U. S., at 728 (emphasis supplied). Although the water district there involved exercised certain governmental authorities, its purposes were quite narrow. The Water Storage District was also found to have only an insubstantial effect on nonvoters. Only 77 persons lived within its boundaries and most worked for one of the four corporations which owned 85% of the land within the District. On the other hand, the burdens of the District fell entirely on landowners since all of the costs associated with the District's projects were assessed against landowners in proportion to the benefits received. There was "no way that the economic burdens of district operations can fall on residents *qua* residents .. . ." *Id.,* at 729.

An analysis of the two relevant factors required by *Salyer* demonstrates that the Salt River District possesses significant governmental authority and has a sufficiently wide effect on nonvoters to require application of the strict scrutiny mandated by *Kramer.*

## II

The District involved here clearly exercises substantial governmental powers. The District is a municipal corporation organized under the laws of Arizona and is not, in any sense of the word, a private corporation. Pursuant to the Arizona Constitution, such districts are "political subdivisions of the State, and vested with all the rights, privileges and benefits, and entitled to the immunities and exemptions granted municipalities and political subdivisions under this

---

vote rule does not apply. The Court's decision today ignores the possibility of some alternative plan and instead sanctions an unjustifiable total exclusion.

Constitution or any law of the State or of the United States."
Ariz. Const., Art. 13, § 7. Under the relevant statute con-
trolling agricultural improvement districts, the District is "a
public, political, taxing subdivision of the state, and a munic-
ipal corporation to the extent of the powers and privileges
conferred by this chapter or granted generally to municipal
corporations by the constitution and statutes of the state, in-
cluding immunity of its property and bonds from taxation."
Ariz. Rev. Stat. Ann. § 45–902 (1956).[3] The District's bonds
are tax exempt, and its property is not subject to state or
local property taxation. This attribute clearly indicates the
governmental nature of the District's function. The District
also has the power of eminent domain, a matter of some
import. The District has also been given the power to en-
ter into a wide range of contractual arrangements to secure
energy sources.[4] Inherent in this authorization is the power
to control the use and source of energy generated by the Dis-

---

[3] Arizona state-court decisions have described such agricultural improve-
ment districts as primarily business-oriented. See *ante*, at 368. See also
*Local 266, International Brotherhood of Electrical Workers* v. *Salt River
Project Agricultural Improvement & Power Dist.*, 78 Ariz. 30, 275 P. 2d
393 (1954); *Mesa* v. *Salt River Project Agricultural Improvement &
Power Dist.*, 92 Ariz. 91, 373 P. 2d 722 (1962), appeal dism'd, 372 U. S.
704 (1963). Of course, these state-court descriptions do not control the
question whether the municipal corporation possesses sufficient authority or
function to require application of the voting procedures mandated by the
Fourteenth Amendment. That inquiry is a constitutional question to be
resolved by the courts.

[4] Arizona Rev. Stat. Ann. § 45–935.B (Supp. 1980–1981) provides:
"For the purpose of acquiring or assuring a supply of electric power and
energy to serve the district's customers, the board, for the and in the
name of the district may, without the boundaries of the state, acquire, de-
velop, own, lease, purchase, construct, operate, equip, maintain, repair
and replace, and contract for . . . any form of energy or energy resources
including but not limited to coal, oil, gas, oil shale, uranium and other
nuclear materials, hot water, steam, and other geothermal materials or
minerals, solar energy, wind, water, and water power and compressed
air . . . ."

trict, including the possible use of nuclear power. Obviously, this broad authorization over the field of energy transcends the limited functions of the agricultural water storage district involved in *Salyer*.

The District here also has authority to allocate water within its service area. It has veto power over all transfers of surface water from one place or type of use to another, and this power extends to any "watershed or drainage area which supplies or contributes water for the irrigation of lands within [the] district . . . ." Ariz. Rev. Stat. Ann. § 45–172.5 (Supp. 1980–1981).

Like most "private" utilities, which are often "natural monopolies," see *Otter Tail Power Co.* v. *United States,* 410 U. S. 366 (1973), private utilities in Arizona are subject to regulation by public authority. The Arizona Corporation Commission is empowered to prescribe "just and reasonable rates" as well as to regulate other aspects of the business operations of private utilities. See Ariz. Rev. Stat. Ann. § 40–321 (1974). The rate structure of the District now before us, however, is not subject to control by another state agency because the District is a municipal corporation and itself purports to perform the public function of protecting the public interest that the Corporation Commission would otherwise perform. See Ariz. Const., Art. 13, § 7, Art. 15, § 2. See also *Rubenstein Construction Co.* v. *Salt River Project Agricultural Improvement & Power Dist.,* 76 Ariz. 402, 265 P. 2d 455 (1953) (Salt River Project is not a public service corporation and therefore statute forbidding certain business practices did not apply). Its power to set its own rates and other conditions of service constitutes important attributes of sovereignty. When combined with a consideration of the District's wide-ranging operations which encompass water for agricultural and personal uses, and electrical generation for the needs of hundreds of thousands of customers, it is clear that the District exercises broad governmental power. With respect to energy management and the provision of water

and electricity, the District's power is immense and its authority complete.

It is not relevant that the District does not do more—what is detailed above is substantially more than that involved in the Water Storage District in *Salyer,* and certainly enough to trigger application of the strict standard of the Fourteenth Amendment under our prior cases. Previous cases have expressly upheld application of the strict requirements of the Fourteenth Amendment in situations where somewhat limited functions were involved. *Salyer* itself suggested that it would be a different case if a water district like the one involved in that case generated and sold electricity. In concluding that the Tulare District did not exercise normal governmental authority, the Court specifically noted that the District provided "no other general public services such as schools, housing, transportation, *utilities,* roads, or anything else of the type ordinarily financed by a municipal body." 410 U. S., at 728–729 (emphasis supplied). In *Cipriano* v. *City of Houma,* 395 U. S. 701 (1969), we held that a bond election which concerned only a city's provision of utilities involved a sufficiently broad governmental function. In *Kramer,* the Court noted that the "need for close judicial examination" did not change "because the district meetings and the school board do not have 'general' legislative powers. Our exacting examination is not necessitated by the subject of the election; rather, it is required because some resident citizens are permitted to participate and some are not." 395 U. S., at 629. In *Hadley* v. *Junior College District,* 397 U. S. 50 (1970), the Court applied *Kramer* despite the fact that the powers exercised by the trustees of a Junior College District were substantially less significant than those exercised in *Avery* v. *Midland County,* 390 U. S. 474 (1968). It was sufficient that the trustees performed important governmental functions with sufficient impact throughout the District.

I therefore cannot agree that this line of cases is not applicable here. The authority and power of the District are sufficient to require application of the strict scrutiny required by our cases. This is not a single-purpose water irrigation district, but a large and vital municipal corporation exercising a broad range of initiatives across a spectrum of operations. Moreover, by the nature of the state law, it is presently exercising that authority without direct regulation by state authorities charged with supervising privately owned corporations involved in the same business. The functions and purposes of the Salt River District represent important governmental responsibilities that distinguish this case from *Salyer*.

### III

In terms of the relative impact of the Salt River District's operations on the favored landowner voters and those who may not vote for the officers of this municipal corporation, the contrast with the Water District in *Salyer* is even more pronounced. A bird's-eye view of the District's operations will be helpful. Historically, the Salt River District was concerned only with storing water and delivering it for agricultural uses within the District. This was a crucial service, but it proved too expensive for a wholly private concern to maintain. It needed public help, which it received. It became a municipal corporation, a transformation which rendered its bonds and property tax exempt. It also needed a public subsidy, which was provided by authorizing it to engage in the generation and sale of electricity. It was also authorized to supply water for municipal and other nonagricultural uses.

The area within the District, once primarily rural, now encompasses eight municipalities and a major part of the city of Phoenix. Its original purpose, the supply of irrigation water, now provides only a tiny fraction of its gross income. For the fiscal year ending April 30, 1980, the Dis-

trict had a total operating income of approximately $450 million, 98% of which was derived from the generation of electricity and its sale to approximately 240,000 consumers. See Salt River Project, 1979–1980 Annual Report, p. 25. The District is now the second largest utility in Arizona. Furthermore, as of April 30, 1980, the District had outstanding long-term debt of slightly over $2 billion. Approximately $1.78 billion, or about 88%, of that debt are in the form of revenue bonds secured solely by the revenues from the District's electrical operations. All of the District's capital improvements since 1972 have been financed by revenue bonds, and the general obligation bonds, now representing a small fraction of the District's long-term debt, are being steadily retired from the District's general revenues. It must also be noted that at the present time, 40% of the water delivered by the District is used for nonagricultural purposes—25% for municipal purposes and 15% to schools, playgrounds, parks, and the like.

With these facts in mind, it is indeed curious that the Court would attempt to characterize the District's electrical operations as "incidental" to its water operations, or would consider the power operations to be irrelevant to the legality of the voting scheme.[5] The facts are that in *Salyer* the bur-

---

[5] The parties did not stipulate that the electrical services were unimportant or legally insignificant. In the context of the historical development of the District's power and authority, it was stipulated that the electrical generating function was "incident" to the primary purpose of providing water to District members. Stipulated Statement of Facts, Nos. 12, 17. This historical view, however, in no way undercuts the present inquiry. Even acknowledging that water service remains the "primary" function of the District in some legal sense, the relevant question here is whether the other services are of such a nature to require application of the strict standards of the Fourteenth Amendment. The fact that the generation of electricity is an incident of the water function of the District is not the same as concluding that the provision of electricity is "incidental" in the sense that it is insignificant. Indeed the parties also stipulated that the "District provides a reliable supply of essential electric

dens of the Water District fell entirely on the landowners who were served by the District. Here the landowners could not themselves afford to finance their own project and turned to a public agency to help them. That agency now subsidizes the storage and delivery of irrigation water for agricultural purposes by selling electricity to the public at prices that neither the voters nor any representative public agency has any right to control. Unlike the situation in *Salyer,* the financial burden of supplying irrigation water has been shifted from the landowners to the consumers of electricity.[6] At the very least, the structure of the District's indebtedness together with the history of the District's operations compels a finding that the burdens placed upon the lands within the District are so minimal that they cannot possibly serve as a basis for limiting the franchise to property owners.

Like the Court of Appeals, I cannot help but conclude as follows:

> "[T]he operation of the utility has taken on independent significance. In view of the magnitude of the electric utility operations and the large percentage of the water services which are used and paid for in a manner unrelated to land ownership, it would elevate form over sub-

---

energy and water in substantial portions of the Salt River Valley; thus, the District operation is important to the development of the Salt River Valley." *Id.,* No. 46.

[6] The extent of the subsidy is substantial. The parties stipulated that:

"During the last ten years about 83% of the water system costs have been financed with power revenues. In 1974, revenues from water and irrigation activities were $2,613,184. The expenses, including depreciation, for irrigation and water operations exceeded revenues by about $14,000,000, and that deficit was met from power revenues. Water support has averaged approximately $10,000,000 annually since 1965. These amounts do not include expenditures for additions and improvements to the irrigation plant and for repayment of long-term debt, which must also be met from power revenues. Any decrease in support from power revenues would have to be met from increased water delivery charges." *Id.,* No. 45.

stance to characterize the District as functioning solely for the benefit of the landowners." 613 F. 2d, at 184.

In *Cipriano,* the only item at issue was an election concerning bonds to be used solely for the improvement of the municipally owned utility system. Of substantial importance to the resolution of this case, the Court said:

"Of course, the operation of the utility systems—gas, water, and electricity—affects virtually every resident of the city, nonproperty owners as well as property owners. All users pay utility bills, and the rates may be affected substantially by the amount of revenue bonds outstanding. Certainly property owners are not alone in feeling the impact of bad utility service or high rates, or in reaping the benefits of good service and low rates." 395 U. S., at 705.[7]

It is apparent in this case that landowning irrigators are getting a free ride at the expense of the users of electricity. It would also seem apparent that except for the subsidy, utility rates would be lower. Of course, subsidizing agricultural operations may well be in the public interest in Arizona, but it does not follow that the amount of the subsidy and the manner in which it is provided should be totally in the hands of a select few.[8]

---

[7] The Salt River District authorities thought the issue in *Cipriano* to be so substantially akin to the issue with respect to its operations that it decided to file an *amicus* brief in that case. See Brief for the Salt River Project Agricultural Improvement and Power District as *Amicus Curiae,* O. T. 1968, No. 705. The District argued that the bonds at issue in *Cipriano* went only to the city's conduct of its utility function and thus affected "only a particular segment of those general governmental powers," *id.,* at 5, so that *Kramer* should not be applied. We necessarily rejected the District's arguments on the merits in *Cipriano.*

[8] It may well be that if given a chance to participate, nonproperty owners will seek to lessen the subsidy. But this is no excuse for denying them the vote. A State is constitutionally prohibited from disenfranchis-

To conclude that the effect of the District's operations in this case is substantially akin to that in *Salyer* ignores reality. As recognized in *Salyer,* there were "no towns, shops, hospitals, or other facilities designed to improve the quality of life within the district boundaries, and it does not have a fire department, police, buses, or trains." 410 U. S., at 729. In short, there was nothing in the Water Storage District for its operations to affect except the land itself. The relationship between the burdens of the District and the land within the District's boundaries was strong. Here, the District encompasses one of the major metropolitan areas in the country. The effects of the provision of water and electricity on the citizens of the city are as major as they are obvious. There is no strong relationship between the District's operation and the land *qua* land. The District's revenues and bonds are tied directly to the electrical operation. Any encumbrance on the land is at best speculative. Certainly, any direct impact on the land is no greater than in *Phoenix* v. *Kolodziejski,* 399 U. S. 204 (1970), where we rejected the same argument presented today. Simply put, the District is an integral governmental actor providing important governmental services to residents of the District. To conclude otherwise is to ignore the urban reality of the District's operations.[9]

---

ing any "sector of the population because of the way they may vote . . . ." *Carrington* v. *Rash,* 380 U. S. 89, 94 (1965).

[9] Nothing in *Cipriano* turned on the fact that the city's utility activities were connected with its broader grants of police power and were not conducted by a separately elected board or commission. While the Court noted that any profits from the utility operations would go into the city's general fund, this fact did not contribute to the Court's decision to extend the franchise. Rather, the Court noted that property and nonproperty taxpayers may have different views concerning provision of city funds for utilities, and that it was this concern with the utility services which required application of *Kramer.*

It is also significant that the Court's decision today is inconsistent with the narrow, and correct, reading given *Salyer* in various other courts in

## IV

Underlying the Court's conclusion in this case is the view that the provision of electricity and water is essentially private enterprise and not sufficiently governmental—that the District "simply does not exercise the sort of governmental powers that invoke the strict demands" of the Fourteenth Amendment because it does not administer "such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." *Ante,* at 366. This is a distinctly odd view of the reach of municipal services in this day and age. Supplying water for domestic and industrial uses is almost everywhere the responsibility of local government, and this function is intimately connected with sanitation and health. Nor is it any more accurate to consider the supplying of electricity as essentially a private function. The United States Government and its agencies generate and sell substantial amounts of power; and in view of the widespread existence of municipal utility systems, it is facetious to suggest that the operation of such utility systems should be considered as an incidental aspect of municipal government. Nor will it do, it seems to me, to return to the proprietary-governmental dichotomy in order to deliver into wholly private hands the control of a major municipal activity which acts to subsidize a limited number of landowners.[10]

---

circumstances akin to those in the present case. See, *e. g., Choudhry* v. *Free,* 17 Cal. 3d 660, 552 P. 2d 438 (1976); *Johnson* v. *Lewiston Orchards Irrigation Dist.,* 99 Idaho 501, 584 P. 2d 646 (1978).

[10] In this regard, the Court's citation of *Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345 (1974), is totally misplaced. In that case, the Court held that actions of a privately owned utility do not constitute state action for purposes of the Fourteenth Amendment. The Court noted that the provision of utility services is "not traditionally the exclusive prerogative of the State." *Id.,* at 353. But this observation necessarily implies that the provision of utilities if actually provided by the State is a valid government activity. Thus, the question whether the Fourteenth Amend-

In *Indian Towing Co.* v. *United States,* 350 U. S. 61, 67–68 (1955), the Court remarked:

> " 'Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it.' *Federal Crop Insurance Corp.* v. *Merrill,* 332 U. S. 380, 383–384. On the other hand, it is hard to think of any governmental activity on the 'operational level,' our present concern, which is 'uniquely governmental,' in the sense that its kind has not at one time or another been, or could not conceivably be, privately performed.' "

In *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389 (1978), JUSTICE STEWART, after quoting the above passage from *Indian Towing Co.,* described the distinction between "proprietary" and "governmental" activities as a "quagmire" involving a distinction " 'so finespun and capricious as to be almost incapable of being held in the mind for adequate formulation.' " *Id.,* at 433 (dissenting opinion) (quoting *Indian Towing Co., supra,* at 68). JUSTICE STEWART went on to conclude that whether proprietary or not, the action of providing electrical utility services "is surely an act of government." 435 U. S., at 434.

In *Salyer,* the Court nowhere suggested that the provision of water for agricultural purposes was anything but governmental action for a public purpose. The Court expressly recognized that the Water District was a public entity. The question presented, in part, was whether its operations and authority were so narrow as not to require application of the *Kramer* rule. In *Cipriano,* the Court necessarily held

---

ment may require certain safeguards *if the State in fact does itself* provide utility services is in no way reached by *Jackson.* See *Id.,* at 354, n. 9 (States may not segregate public schools so as to exclude any religious group while private religious schools may so exclude). Once a State provides such services, constitutional safeguards necessarily apply.

that the provision of electrical, water, and gas utility services was a sufficiently important governmental service to require application of the Fourteenth Amendment's strict scrutiny safeguards. 395 U. S., at 705. If the provision of electrical and other utility services by a municipal corporation was so "proprietary" or "private" as not to require application of the stricter standards of the Fourteenth Amendment, *Cipriano* could not have been decided as it was. The Court's facile characterization of the electrical service provided by the municipal corporation in this case as essentially a private function is a misreading of our prior holdings.

## V

The purpose and authority of the Salt River District are of extreme *public* importance. The District affects the daily lives of thousands of citizens who because of the present voting scheme and the powers vested in the District by the State are unable to participate in any meaningful way in the conduct of the District's operations.[11] In my view, the Court of Appeals properly reasoned that the limited exception rec-

---

[11] It is suggested by the Court in a footnote, see *ante,* at 371, n. 20, and by JUSTICE POWELL in his concurring opinion that since the nonvoters living in the District may, of course, vote in the state legislature elections, their interests are sufficiently represented since the state legislature maintains ultimate control over the operation and authority of the District. This suggestion lacks merit and has been specifically rejected in past decisions of this Court. *Avery* v. *Midland County,* 390 U. S., at 481. See *Kramer,* 395 U. S., at 628, n. 10. In most situations involving a state agency or even a city, the state legislature and ultimately the people could exercise control since any municipal corporation is a creature of the State. The Fourteenth Amendment requires a far more direct sense of democratic participation in elective schemes which is not satisfied by the indirect and imprecise voter control suggested by the Court and by JUSTICE POWELL. Cf. *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 406 (1978) (rejecting argument that Sherman Act should not apply to municipally owned utility because dissatisfied consumers had recourse in state legislature).

ognized in *Salyer* does not save this voting arrangement. I cannot agree with the Court's extension of *Salyer* to the facts of the case, and its unwise suggestion that the provision of electrical and water services are somehow too private to warrant the Fourteenth Amendment's safeguards. Accordingly, I dissent.