Valerie CUNNINGHAM, et
al., Plaintiffs,

v.

MUNICIPALITY OF METROPOLITAN
SEATTLE, et al., Defendants.

No. C89–1587 WD.

United States District Court,
W.D. Washington,
at Seattle.

Sept. 6, 1990.

See also 751 F.Supp. 899.

Thomas W. Burt, Daniel S. Gottlieb, Hugh R. Tobin, Walter Walkinshaw, Riddell, Williams, Bullitt & Walkinshaw, Seattle, Wash., for plaintiffs Valerie Cunningham, Imogene Pugh, Elizabeth Springer and Monica Zucker.

Robert L. Gunter, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, Wash., for defendants Tom Hill, Paul Barden, Gary Grant, Audrey Gruger, Bruce Laing, Greg Nickels, Lois North, Bill Reams, Ron Sims, Cynthia Sullivan, Robert L. Neir, Fred Jarrett, Doreen Marchione, Earl Clymer, Charles Royer, George Benson, Virginia Galle, Paul Kraabel, Jane Noland, Norm Rice, Dolores Sibonga, Sam Smith, Jim Street, Jeanette Williams, Bob Boscole, Irvin Potter, A.J. Culver, James Desalvo, Bill Domarotsky, Connie King, Lonnie McLean and Richard Ramsey.

Robert L. Gunter, Stephen A. Smith, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, Wash., for defendants City of Seattle, Mun. of Metropolitan Seattle, Steve Stevlingson and Beverly Tweddle, each in his/her capacity as a member of the Metro Council.

James Kendrick Pharris, Atty. Gen. Office Administration, Olympia, Wash., for defendants Ralph Munro, Secretary of State and Ken Eikenberry, Atty. Gen.

Norman K. Maleng, Seattle, Wash., for amicus curiae King County.

DWYER, District Judge.

## I.

### INTRODUCTION

The plaintiffs, registered voters in King County, Washington, challenge the constitutionality of the method by which the governing council of the Municipality of Metropolitan Seattle ("Metro") is selected. Metro is the entity in charge of water pollution abatement and public transportation throughout the county. The defendants are Metro and its current chairperson. Both sides have moved for summary judgment. All briefs, affidavits, and other materials filed by the parties, the *amicus curiae* brief of the Attorney General of the State of Washington, and the oral arguments of counsel, have been fully considered. The parties agree that no genuine issue of material fact exists and that the case may be decided on the cross-motions under Fed.R.Civ.P. 56.

## II.

### THE ONE PERSON, ONE VOTE PRINCIPLE

■ The plaintiffs' primary challenge to the selection of the Metro Council is brought under the one person, one vote principle of the Equal Protection Clause of the Fourteenth Amendment. The plaintiffs, as voters living in parts of the county that are under-represented if the principle applies, have standing to sue, and a justiciable controversy is presented. *See Baker v. Carr*, 369 U.S. 186, 204–37, 82 S.Ct. 691, 703–721, 7 L.Ed.2d 663 (1962). The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

■ In a series of landmark cases the Supreme Court has held that where state or local government officials are elected, equal protection requires that the votes of citizens be of equal weight. No person's vote may be reduced in value, compared to the votes of others, because of where he or she happens to live in the electoral district.

In *Reynolds v. Sims*, 377 U.S. 533, 567, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506 (1964), the Court struck down Alabama's method of selecting its state legislature, stating:

To the extent that a citizen's right to vote is debased, he is that much less a citizen. The fact that an individual lives here or there is not a legitimate reason for overweighting or diluting the efficacy of his vote. The complexions of societies and civilizations change, often with amazing rapidity. A nation once primarily rural in character becomes predominantly urban. Representation schemes

once fair and equitable become archaic and outdated. But the basic principle of representative government remains, and must remain, unchanged—the weight of a citizen's vote cannot be made to depend on where he lives.

In *Hadley v. Junior College District*, 397 U.S. 50, 90 S.Ct. 791, 25 L.Ed.2d 45 (1970), the Court applied the one person, one vote rule to a state statutory formula for electing junior college trustees, stating:

This Court has consistently held in a long series of cases, that in situations involving elections, the States are required to insure that each person's vote counts as much, insofar as it is practicable, as any other person's. We have applied this principle in congressional elections, state legislative elections, and local elections. The consistent theme of those decisions is that the right to vote in an election is protected by the United States Constitution against dilution or debasement. While the particular offices involved in these cases have varied, in each case a constant factor is the decision of the government to have citizens participate individually by ballot in the selection of certain people who carry out governmental functions.

*Id.* at 54, 90 S.Ct. at 794 (footnote omitted).

Most recently, in *Board of Estimate v. Morris*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989), the Court applied the principle to New York City's Board of Estimate, whose eight members were not elected as such but took office upon their election to other positions. The members were the city's mayor, comptroller, and president of the city council (the three city-wide members), and the presidents of the five boroughs in the city. Holding the selection system unconstitutional because the five boroughs were of widely differing population sizes, and the citizens' votes were therefore unequally weighted as to all but the city-wide members, the Court said:

These [earlier] cases are based on the propositions that in this country the people govern themselves through their elected representatives and that "each and every citizen has an inalienable right to full and effective participation in the political processes" of the legislative bodies of the Nation, state, or locality as the case may be. *Reynolds v. Sims*, 377 U.S., at 565, 84 S.Ct., at 1378. Since "[m]ost citizens can achieve this participation only as qualified voters through the election of legislators to represent them," full and effective participation requires "that each citizen have an equally effective voice in the election of members of his ... legislature." *Ibid.* As Daniel Webster once said, "the right to choose a representative is every man's portion of sovereign power." *Luther v. Borden*, 48 U.S. (7 How.) 1, 30, 12 L.Ed. 581 (1849) (statement of counsel).

*Id.* 109 S.Ct. at 1438.

It does not matter whether the governmental powers possessed be deemed "legislative" or "administrative"; if the body possessing them is elected, the one person, one vote principle applies. *Hadley*, 397 U.S. at 55–56, 90 S.Ct. at 794–95. The one person, one vote principle does not forbid the states to use appointed, as distinguished from elected, bodies to carry out governmental functions, nor does it preclude experiments in new forms of local government. *Sailors v. Board of Education*, 387 U.S. 105, 110–111, 87 S.Ct. 1549, 1553, 18 L.Ed.2d 650 (1967). It also does not apply to an elected body whose functions are so narrow as to be not "governmental." *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.*, 410 U.S. 719, 727–30, 93 S.Ct. 1224, 1229–31, 35 L.Ed.2d 659 (1973); *see also Ball v. James*, 451 U.S. 355, 364, 101 S.Ct. 1811, 68 L.Ed.2d 150 (1981).

The heart of the matter was stated by the Supreme Court in *Hadley*, 397 U.S. at 56, 90 S.Ct. at 795:

[W]henever a state or local government decides to select persons by popular election to perform governmental functions, the Equal Protection Clause of the Fourteenth Amendment requires that each qualified voter must be given an equal opportunity to participate in that election, and when members of an elected body are chosen from separate districts,

each district must be established on a basis that will insure, as far as is practicable, that equal numbers of voters can vote for proportionally equal numbers of officials.

The questions in the present case come down to these:

Does Metro possess governmental powers?

Is the Metro Council an elected body?

If the one person, one vote principle applies, does the method of selecting the Metro Council violate it?

If the answer to the preceding question is yes, what should the remedy be?

## III.

## METRO'S SUCCESS, ACCEPTANCE, AND FUTURE PROSPECTS

The arguments in Metro's behalf have emphasized its successes and have warned that a change in its structure may jeopardize its future. There is no doubt that Metro has been a great historic achievement. It was formed in 1958, before the Supreme Court's decisions applying the one person, one vote rule to state and local governments. Its original aim was to bring local governments together in a federation to clean up pollution in Lake Washington. In this Metro succeeded, and it has gone on to implement a water pollution abatement and sewage disposal program and a major public transportation system. The voters of King County have rejected a proposal to turn Metro's functions over to the county government.

■ The difficulty with these arguments is that efficiency and acceptance cannot justify a denial of equal protection of the laws. The citizens who criticize Metro's operations, and who seek to make it more democratic and responsive (as they see it), may be a minority, but the constitutional issue cannot be decided by a show of hands. That the buses run on time cannot justify a dilution of any citizen's right to vote.

Arguments of the same nature—success, acceptance, and the risks of change—were

made to the Supreme Court in behalf of New York's Board of Estimate. *See* 109 S.Ct. at 1442. The Court rejected them, saying it was "not persuaded by arguments that explain the debasement of citizens' constitutional right to equal franchise based on exigencies of history or convenience." *Id.* at 1442 n. 10. In an earlier case, the Court stated: "An individual's constitutionally protected right to cast an equally weighted vote cannot be denied even by a vote of a majority of a State's electorate." *Lucas v. Forty–Fourth Gen. Assembly*, 377 U.S. 713, 736, 84 S.Ct. 1459, 1473, 12 L.Ed.2d 632 (1964).

There are always risks in change, but often worse ones in rigidity. There is no reason to believe that the vigorous governments and citizens of this region will fail to make Metro a continuing success if a change in the method of selecting its council is required to meet constitutional standards.

## IV.

## METRO'S POSSESSION OF GOVERNMENTAL POWERS

■ Metro is the only municipal corporation ever to exist under its authorizing statute, RCW Ch. 35.58.

The statute grants to the Metro Council legislative, financial, and other decision-making powers to carry out its functions of water pollution abatement and public transportation throughout King County. The broad purpose of Metro, according to the statute, is to "provide for the people ... the means of obtaining essential services not adequately provided by existing agencies of local government." RCW § 35.58.010.

By statute, "every legislative act of the [Metro] Council of a general or permanent nature shall be by resolution." RCW § 35.58.130. The act grants to Metro "all powers which are necessary to carry out the purposes of the metropolitan municipal corporation and to perform authorized metropolitan functions." RCW § 35.58.180.

890

The statute recognizes that Metro is empowered to perform governmental functions, stating: "All functions of local government which are not authorized as provided in this chapter to be performed by a metropolitan municipal corporation, shall continue to be performed by the counties, cities and special districts...." RCW § 35.58.180.

Metro is authorized to operate a mass transit system and water pollution abatement facilities. RCW §§ 35.58.050(3), —.200(2). It sets minimum standards for water pollution abatement facilities connected to its systems. Local governments with connected systems may not construct abatement facilities "without first securing [Metro's] approval." RCW 35.58.200(5). Metro is empowered to "take all actions necessary" to secure the benefits, and meet the requirements, of federal and state water pollution programs developed under the federal water pollution control act, 33 U.S.C. § 1251 *et seq.* It can compel its component agencies to comply with the requirements of national discharge elimination system permits issued to Metro or to the component agencies. RCW § 35.58.200(7).

Several powers are authorized for Metro's use in financing its operations: fixing rates and charges for local agencies' use of Metro water pollution abatement facilities; imposing charges directly on sewage system users who connect to Metro sewage facilities or establish new sewer service; appropriating general funds; levying sales taxes (with voter approval); levying excise or business and occupation taxes; issuing general obligation bonds for transit or water pollution abatement activities (some bonds require voter approval); and appropriating funds from its budget. RCW §§ 35.58.116, –200(4), –.2721, –.273, –.450, –.570; 35.95.030, –.040; 82.14.045, –.050, –.060.

Metro has the power to acquire by condemnation local governments' mass transit assets and sewage disposal and storm water drainage facilities, with certain limitations. RCW §§ 35.58.200(2), –.240(2), –.250. It can prepare comprehensive water pollu-

tion abatement and transportation plans for the county. RCW §§ 35.58.200(1), –.240(1).

Metro also possesses certain police powers. It can adopt rules and regulations "as shall be necessary or proper to enable it to carry out authorized metropolitan functions" and can provide penalties for their violation, enforceable in King County Superior Court. RCW § 35.58.360. It can require certain King County political subdivisions to discharge sewage into Metro facilities, if it first declares that such action is necessary for public safety, health, and welfare. RCW § 35.58.200(3).

Metro currently exercises, or has exercised, many of these powers. It operates, in a county with more than 1.4 million residents, a county-wide mass transit system and a sewage system. Metro has contracted for the construction of facilities for its systems, sometimes amid public controversy. It charges connected local government entities for sewage services, and imposes a direct charge on new users of its sewage system. It has levied sales taxes (with voter approval) and a motor vehicle excise tax, and has issued millions of dollars worth of bonds. Its current annual budget is more than half a billion dollars. It has condemned property to support its activities. It has adopted and amended a comprehensive water pollution abatement plan, and is planning future mass transit systems to accommodate population growth. It has established programs to combat drug-abuse problems related to its transit operations.

■ The powers actually exercised by Metro are enough to place it clearly within the scope of the one person, one vote principle if its governing body is elected. However, the powers possessed but not exercised—or not yet exercised—must also be included in the analysis. *Cf. Hadley,* 397 U.S. at 53, 90 S.Ct. at 793.

Metro's reliance on *Salyer Land Co. v. Tulare Lake Basin Water Storage District,* 410 U.S. 719, 727–30, 93 S.Ct. 1224, 1229–31, 35 L.Ed.2d 659 (1973), is misplaced. The Court there carved out an exception to the one person, one vote prin-

ciple for official bodies that do not exercise "governmental" functions. 410 U.S. at 727–30, 93 S.Ct. at 1229–31. The statute in question permitted only landowners to vote in electing directors of a water district whose function was to provide water, chiefly used in farming by a few corporations, to a large area having a small number of individual residents. *Id.* at 723–25, 93 S.Ct. at 1227–28. The Court noted that the district provided "no other general public services such as schools, housing, *transportation, utilities,* roads, or anything else of the type ordinarily financed by a municipal body." *Id.* at 728–29, 93 S.Ct. at 1229–30 (emphasis added). In *Ball v. James,* 451 U.S. 355, 364, 101 S.Ct. 1811, 1817, 68 L.Ed.2d 150 (1981), the Court described a two-part test for the *Salyer* exception: (1) the body's purpose must be sufficiently narrow and limited, and (2) the effects of its activities must be borne disproportionately by a few. *See also Associated Enters., Inc. v. Toltec Watershed Improvement Dist.,* 410 U.S. 743, 744–45, 93 S.Ct. 1237, 1237–38, 35 L.Ed.2d 675 (1973) (upholding constitutionality of Wyoming watershed improvement district under two-part test).

Metro, with its broad governmental powers and important impact on the lives of all residents of King County, cannot qualify for the *Salyer* exception. The Supreme Court has found governmental bodies with far more limited functions to be within the scope of the one person, one vote principle. *See, e.g., Hadley,* 397 U.S. at 53–54, 90 S.Ct. at 793–94 (junior college board had powers "general enough and [with] sufficient impact throughout the district to justify the conclusion that" one person, one vote doctrine should apply).

## V.

## STATUS OF THE METRO COUNCIL AS AN ELECTED BODY

■ Equal protection of the laws requires that the one person, one vote principle be honored if a governmental body is elected, not if it is appointed. *Hadley,* 397 U.S. at 54, 56, 58, 90 S.Ct. at 794, 795, 796. Plaintiffs contend that the Metro Council is

elected. Defendants argue that it is appointed. The two sides agree that the question turns on whether a *majority* of the board members are deemed elected or appointed. *Cf. Oliver v. Board of Educ.,* 306 F.Supp. 1286, 1289 (S.D.N.Y.1969) (applying one person-one vote doctrine to board with five elected and two appointed members).

The Metro Council has forty-two members. They are selected by a method prescribed by RCW § 35.58.120, set out in Appendix A.

■ It is uncontested that the King County Executive is an elected member of the Council. The statute provides that one member "shall be the elected county executive of the central county." RCW § 35.58.120(1). Thus, while a candidate for executive is not listed on the ballot as a candidate for the Metro Council, he is in fact running for both offices. The result is exactly the same as if the ballot title read "County Executive/Member of Metro Council." In a similar situation the Supreme Court last year held the one person, one vote requirement applicable, stating: "That the members of New York City's Board of Estimate trigger this constitutional safeguard is certain. All eight officials become members as a matter of law upon their various elections." *Board of Estimate,* 109 S.Ct. at 1438.

For the same reason the mayors of five cities must be held to be elected members of the Council. The statute provides for one member from each component city with a population of fifteen thousand or more "who shall be the mayor of such city, if such city shall have the mayor-council form of government." RCW § 35.58.120(4). The mayors of the five cities in this category—Seattle, Renton, Auburn, Kent, and Redmond—all "become members as a matter of law upon their various elections." Accordingly they must be deemed elected members of the Council.

■ All nine members of the King County Council also become members of the Metro Council automatically upon their election. The statute provides for one

member for each "county council district which shall contain fifteen thousand or more persons residing within the metropolitan municipal corporation, who shall be the county commissioner or county councilman from such district." RCW § 35.58.120(2). The King County Council districts at all relevant times have contained far more than fifteen thousand residents each. Thus when a person runs for the County Council he or she is also running for the Metro Council. Under the *Board of Estimate* rule these persons are elected members of the Metro Council.

All nine members of the Seattle City Council also serve as members of the Metro Council. The statute provides for:

One additional member selected by the city council of each component city containing a population of fifteen thousand or more for each fifty thousand population over and above the first fifteen thousand, such members to be selected from such city council until all councilmen are members and thereafter to be selected from other officers of such city.

RCW § 35.58.120(6).

While the statute says that these members will be "selected from such city council until all councilmen are members," there is in reality no selection as to Seattle. The city's population is, and has been, such that each city council member automatically becomes a member of the Metro Council. The result is no different than if the statute provided expressly that each candidate for the Seattle City Council would also be running for the Metro Council and would assume both offices if successful. *See Board of Estimate*, 109 S.Ct. at 1438 ("when residents of the city's five boroughs ... elect their respective borough presidents, the elections decide each borough's representatives on the board").

Metro has argued that the population of Seattle might drop so as to reduce the number of city council members who would serve on the Metro Council, and that there would then be a "selection" within the city council. But that is not the reality. All nine Seattle City Council members have automatically become Metro Council mem-

bers for many years. Given the city's 1989 population of 497,200 and its continuing growth, the statute guarantees that this will remain the case. Whether it provides this explicitly or by means of a formula written to fit Seattle's population statistics is of no moment. "[T]he Constitution," the Supreme Court has noted, "forbids 'sophisticated as well as simpleminded modes of discrimination.'" *Reynolds*, 377 U.S. at 563, 84 S.Ct. at 1382 (quoting *Lane v. Wilson*, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281 (1939)).

The foregoing categories—the county executive, mayors, King County Council members, and Seattle City Council members—add up to twenty-four members who are elected to the Metro Council because they take office automatically upon election to their county or city positions. They are chosen by the voters at the polls. There is no step in their designation, no act of selection, beyond the voters' decision to place them in office. These Metro Council members come within the Supreme Court's holding twenty years ago in *Hadley*, restated last year in *Board of Estimate:* "Whenever a state or local government decides to select persons by popular election to perform governmental functions ...." *Hadley*, 397 U.S. at 56, 90 S.Ct. at 795, *quoted in Board of Estimate*, 109 S.Ct. at 1437. These twenty-four are "selected by popular election."

■ The remaining eighteen members of the Metro Council must be deemed appointed, although the status of some is clearer than that of others.

The parties agree that the chairman of the Council, who is chosen by its members and must hold no other public office (RCW § 35.58.120(8)), holds office by appointment.

Eight members are chosen by the County Council to represent unincorporated areas of the county (one such member for each council district containing fifteen thousand or more persons residing in unincorporated areas). RCW § 35.58.120(3). These are also appointed rather than elected.

The remaining nine members are public officials who do not take seats on the Metro Council upon their election to other offices, but rather are chosen from a pool of public officials. These are:

—Five representatives from cities, with a population of at least fifteen thousand, which do not have the mayor-council form of government. These are "selected by, and from, the mayor and city council of each of such cities." RCW § 35.58.120(4).

—One representative of all cities in the county having less than fifteen thousand in population. This member is chosen by and from the mayors of these smaller cities. RCW § 35.58.120(5).

—One member selected from its membership by the city council of Bellevue (the only city, other than Seattle, having at least sixty-five thousand people and thus coming within the scope of RCW § 35.58.120(6)).

—Two members selected by and from certain sewer and water district commissioners. RCW § 35.58.120(7).

In *Sailors v. Board of Education*, 387 U.S. 105, 87 S.Ct. 1549, 18 L.Ed.2d 650 (1967), the Court considered a one person, one vote challenge to a county school board. The voters elected local school boards, and these sent one delegate each to meet and choose the county board. Finding that this system "is basically appointive rather than elective," *id.* at 109, 87 S.Ct. at 1552, the Court held that the one person, one vote principle did not apply: "[T]he membership of the county board is not determined, directly or indirectly, through an election in which the residents of the county participate." *Id.* at 109 n. 6, 87 S.Ct. at 1553 n. 6; *see also id.* at 110–11, 87 S.Ct. at 1553.

In *Sailors* the delegates could select persons to serve on the county board who were not members of a local school board. *Id.* at 107, 87 S.Ct. at 1551. The situation is different as to the nine Metro Council members described above in that the selection is made from groups of elected officials. Are these, then, selected by appointment or by election? There is no reported case exactly in point. However, the reasoning of the Supreme Court decisions compels the conclusion that they are appointed. They do not, as in *Board of Estimate*, "become members as a matter of law upon their various elections." 109 S.Ct. at 1438. There is an appointive step: the selection of these persons, and the non-selection of others, must be decided upon not by the voters but by others charged by law with the duty of choosing. That the appointment is made from a prescribed group of public officials does not make the office elective rather than appointive.

In summary, twenty-four of the forty-two Metro Council members are elected, and eighteen are appointed.

■■■ Since a majority of its members are elected, the Council must be held to be an elected body. Because it exercises governmental powers, the method of selecting it must comply with the one person, one vote principle. That being so, it is unnecessary to decide whether and how the principle might apply if only a minority of the Council's members were elected.

## VI.

## VIOLATION OF THE ONE PERSON, ONE VOTE PRINCIPLE

The parties agree that if the one person, one vote principle applies, the current method of selecting the Metro Council violates it. The argument is over whether the plaintiffs' calculation of the degree of disproportionate representation is flawed.

■■■ Disproportionality is calculated by a method set forth in *Abate v. Mundt*, 403 U.S. 182, 184 & n. 1, 91 S.Ct. 1904, 1906 & n. 1, 29 L.Ed.2d 399 (1971). Actual ratios of residents to representatives are compared to an ideal ratio, i.e., that which would exist if each resident's vote had equal voting weight.

■■■ How to calculate disproportionate representation for government bodies that have both elected and appointed members appears to be a question of first impression.

Although the district court in *Oliver, supra,* held that representation on such a mixed government body was disproportionate, it did not calculate the extent of deviation nor suggest a method of doing so. *See Oliver v. Board of Educ.,* 306 F.Supp. 1286, 1289 (S.D.N.Y.1969). In *Board of Estimate,* the Court held that members of the board who were elected at large, as well as the borough presidents, had to be considered:

> In calculating the deviation among districts, the relevant inquiry is whether "the vote of any citizen is approximately equal in weight to that of any other citizen," the aim being to provide "fair and effective representation for all citizens." Here the voters in each borough vote for the at-large members as well as their borough president, and they are also represented by those members. Hence in determining whether there is substantially equal voting power and representation, the citywide members are a major component in the calculation and should not be ignored.

109 S.Ct. at 1441–42 (citations omitted; quoting *Reynolds,* 377 U.S. at 565–66, 579, 84 S.Ct. at 1383–84, 1390).

The quoted passage implies that appointed members of a mixed board should not be counted in calculating the deviation, because the voters do not select them. The aim of one person, one vote—to protect each voter's right to an equal voice in choosing elected representatives—is not involved where members of a board are appointed. *See Sailors,* 387 U.S. at 111, 87 S.Ct. at 1553 (one person, one vote not applicable "[s]ince the choice of members of the county school board did not involve an election").

Further, since the appointed members are not elected, the court would have to decide whom they are supposed to represent. In some instances this might be feasible but in others it would not be. The speculative nature of the undertaking is demonstrated by the multiple deviation calculations made by the parties' experts.

Accordingly, appointed members should not be counted in calculating the deviations in representations on the Metro council.

■ The ideal ratio under *Abate* is computed by dividing the population of the electoral district by the number of representatives on the government body in question. The population of King County, 1,446,000, divided by 24 elected members, equals 60,250. (All population figures used are for 1989; the parties agreed at oral argument that there is no dispute regarding levels of population.) The ideal voter-to-representative ratio on the Metro Council would therefore be 60,250 to 1.

To find the percentage deviation for each voting area, the actual ratio of voters-to-representatives must be calculated. Each area is represented by the council members elected on a county-wide basis; some are represented, in addition, by one or more members elected locally.

The number of at-large representatives per area is found by multiplying each area's percentage of the total King County population by the total number of at-large representatives. It is assumed for this purpose that substantial equality of population exists among the King County Council districts.

For example, Seattle has a population of 497,200, which is approximately 34.38% of the King County population. That percentage figure, multiplied by ten (the nine King County council members plus the county executive), results in 3.438 at-large members representing Seattle.

When Seattle's other ten representatives (the mayor and nine city council members) are added, the city's representation on the Metro Council is computed as 13.438.

The ratio of voters-per-representative is then calculated by dividing the voting area's population by the number of its representatives. In Seattle's case, 497,200 divided by 13.438 yields a ratio of 37,000 voters per representative.

The final step in calculating the percentage deviation for each area is to subtract the actual number of residents in the area's voters-per-representative ratio from the

ideal number, and divide the result by the ideal. If the ideal is greater than the actual number, the result will be a positive percentage, which means that that district is over-represented. For example, subtracting Seattle's 37,000 actual ratio from the ideal of 60,250, and dividing the result by 60,250, yields a percentage deviation of + 38.59%, meaning that Seattle is over-represented by that percentage. Conversely, if the ideal is less than the actual number, a negative percentage showing under-representation will result.

The percentage deviations for governmental areas within Metro's boundaries are set forth in the attached Appendix B. The population figures used therein are undisputed.

The maximum percentage deviation from the ideal ratio is computed by adding the absolute values of the percentage deviations of the most over-represented and most under-represented areas. The Metro Council thus has a maximum deviation of 196.47%. *See* Appendix B.

Although the Constitution does not require that representation match the ideal ratio with mathematical precision, the deviation here is greater than the 78% found in *Board of Estimate* to violate the Equal Protection Clause. *See* 109 S.Ct. at 1442; *Reynolds*, 377 U.S. at 569, 84 S.Ct. at 1385 ("mathematical nicety is not a constitutional requisite").

The parties' methods of calculating also yield deviations far beyond what is permissible. Plaintiffs' expert used alternative methods with results varying from 181% to 272%. Affidavit of Dr. Richard Morrill at 4–5 (June 14, 1990) (Dkt. # 50). Defendants do not propose a specific figure. However, their expert calculated a maximum deviation of 327.16% in responding to the calculation methods used by plaintiffs' expert. *See* Second Declaration of Laurie McCutcheon at 7 (July 1, 1990) (Dkt. # 65).

Defendants contend that average deviations should be used to take into account three different groups—urban, suburban, and unincorporated—whose group interests the selection statute is allegedly designed to represent. Such a method would tend to

understate the deviation, because an average obscures the extremes to produce a midpoint. Yet voting rights are individual, not group, rights. It is one person, one vote that the Constitution requires. *See, e.g., Board of Estimate*, 109 S.Ct. at 1440. The type of regional grouping proposed by defendants was rejected in *Reynolds*, where the Supreme Court held that "the weight of a citizen's vote cannot be made to depend on where he lives." 377 U.S. at 567, 84 S.Ct. at 1384.

> [N]either history alone, nor economic *or other sorts of group interests*, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid–1960's, most claims that deviations from population-based representation can validly be based solely on geographical representation.

*Id.* at 579–80, 84 S.Ct. at 1391 (emphasis added).

Given such a large deviation from the ideal ratio, it is not clear that justifications for the current selection system need even be considered. Even as to a 78% deviation, "the local government seeking to support such a difference between electoral districts would bear a very difficult burden." *Board of Estimate*, 109 S.Ct. at 1442.

Metro has agreed, and the court finds, that the reasons of convenience and history offered for the existing system cannot justify a substantial departure from one person, one vote if the principle applies. *See id.* at 1442 & n. 10.

The current system of selecting Metro Council members results in impermissibly disproportionate representation, and hence a violation of the Equal Protection Clause. Because this ruling is dispositive, the other federal and state constitutional questions

raised by the plaintiffs need not be reached.

## VII.

## DECLARATORY AND INJUNCTIVE RELIEF

The plaintiffs are entitled to a declaratory judgment, and if necessary to injunctive relief, in accordance with the foregoing. However, the entry of judgment will be deferred until officials of the State of Washington are added as parties.

The state has not sought leave to intervene. Instead, it asked and was granted leave to file a brief *amicus curiae*. That brief, and the state's position on the merits, have been fully considered.

■ Metro now argues that the state is an indispensable party under Fed.R.Civ.P. 19(b) in that complete relief cannot be afforded in its absence, and it allegedly cannot be joined. Metro did not raise this argument by motion early in the case, as is commonly done, but only in the summary judgment briefs. The plaintiffs' lawsuit challenges RCW § 35.58.120 only as applied to Metro, not on its face; it is possible that an entity complying with one person, one vote could be constructed under the statute somewhere other than King County. Nevertheless, the statute—and hence the method of selecting the Metro Council—could only be changed by an act of the state legislature. The state is therefore a necessary party that must be joined as a defendant, if joinder is feasible. Fed.R. Civ.P. 19(a); *see also Eldredge v. Carpenters 46 Northern Calif. Counties Joint Apprenticeship & Training Comm.*, 662 F.2d 534, 537 (9th Cir.1981), *cert. denied*, 459 U.S. 917, 103 S.Ct. 231, 74 L.Ed.2d 183 (1982).

■ This action need not be dismissed because there is no impediment to appropriate state officials being joined as defendants. The federal courts have subject matter jurisdiction over cases alleging violation of the one person, one vote principle. *E.g., Baker v. Carr*, 369 U.S. 186, 201, 82 S.Ct. 691, 701, 7 L.Ed.2d 663 (1962) (Brennan, J.) ("unbroken line" of precedents sustains federal courts' jurisdiction over reapportionment cases); *MacGovern v. Connolly*, 637 F.Supp. 111, 112 n. 4 (D.Mass.1986) (line of cases "still unbroken"; contention that Eleventh Amendment bars subject matter jurisdiction over reapportionment cases "cannot be taken seriously").

The appropriate Washington state officials with responsibilities for elections are the Secretary of State and the Attorney General. *E.g., Thigpen v. Meyers*, 211 F.Supp. 826 (W.D.Wash.1962) (three-judge court) (defendants in Washington state apportionment case were secretary of state and attorney general), *aff'd*, 378 U.S. 554, 84 S.Ct. 1905, 12 L.Ed.2d 1024 (1964); *Snyder v. Munro*, 106 Wash.2d 380, 721 P.2d 962 (1986) (secretary of state named as one defendant in apportionment case); RCW § 29.81.020 (attorney general prepares parts of voters' pamphlets); RCW § 43.07.030 (secretary of state's duties include certifying various election results).

The state has made the following request in its *amicus* brief:

> [I]f the Court does agree with the Plaintiffs that RCW 35.58.120 provides a constitutionally unacceptable method of determining the composition of a metropolitan council, the Court should limit the relief granted to a declaratory judgment and should give the Washington State Legislature a reasonable period of time to exercise its political judgment on the best remedy for the situation.

■ There are various ways to cure the constitutional defect in the current method of selecting the Metro Council. The state and Metro should be given a reasonable time and opportunity to arrive at a legislative solution. While they are doing so the operations of Metro should not be disrupted and the November 1990 election of officials who will serve on the Metro Council should go forward without change. As the Court held in *Wise v. Lipscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978):

> When a federal court declares an existing apportionment scheme unconstitutional, it is ... appropriate, whenever

practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.

*See also Morris v. Board of Estimate*, 647 F.Supp. 1463, 1478 (E.D.N.Y.1986) (judiciary's role in restructuring local government elective processes "restricted to seeing that a constitutional plan is enacted in a timely manner"), *aff'd*, 831 F.2d 384 (2d Cir.1987), *aff'd*, 489 U.S. 688, 109 S.Ct. 1433, 103 L.Ed.2d 717 (1989).

Accordingly, it is ordered that:

1. Plaintiffs' motion for summary judgment is granted and defendants' motion for summary judgment is denied, subject to consideration of materials that may be filed under paragraph 3, below.

2. Plaintiffs are directed to file and serve upon the Secretary of State and Attorney General of Washington ("state defendants"), and upon counsel for the existing defendants, within ten days of the date of this order, an amended complaint adding these state officials as defendants.

3. The state defendants are directed to file, within twenty days after being served with the amended complaint, either a notice that they adopt by reference and rely upon the *amicus curiae* brief already filed by the Attorney General, and the existing record, or a memorandum and/or additional affidavits in opposition to plaintiffs' motion for summary judgment.

4. After the state defendants have appeared and filed their notice or brief as provided in paragraph 3, above, the court will reconsider this order if new materials are filed, will issue a final order on the merits, and will hold a hearing, if appropriate, on the nature and scope of relief to be granted.

The clerk is directed to send copies of this order to all counsel of record, and to the Attorney General of the State of Washington as *amicus curiae*.

## APPENDIX A

### *RCW § 35.58.120*

A metropolitan municipal corporation shall be governed by a metropolitan council composed of the following:

(1) One member (a) who shall be the elected county executive of the central county, or (b) if there shall be no elected county executive, one member who shall be selected by, and from, the board of commissioners of the central county.

(2) One additional member for each county commissioner district or county council district which shall contain fifteen thousand or more persons residing within the metropolitan municipal corporation, who shall be the county commissioner or county councilman from such district.

(3) One additional member selected by the board of commissioners or county council of each component county for each county commissioner district or county council district containing fifteen thousand or more persons residing in the unincorporated portion of such commissioner district lying within the metropolitan municipal corporation each such appointee to be a resident of such unincorporated portion.

(4) One member from each component city which shall have a population of fifteen thousand or more persons, who shall be the mayor of such city, if such city shall have the mayor-council form of government, and in other cities shall be selected by, and from, the mayor and city council of each of such cities.

(5) One member representing all component cities which have less than fifteen thousand population each, to be selected by and from the mayors of such smaller cities in the following manner: The mayors of all such cities shall meet prior to July 1 of each even-numbered year at a time and place to be fixed by the metropolitan council. The chairperson of the metropolitan council shall preside. After nominations are made, successive ballots shall be taken until one candidate receives a majority of all votes cast.

(6) One additional member selected by the city council of each component city containing a population of fifteen thousand

or more for each fifty thousand population over and above the first fifteen thousand, such members to be selected from such city council until all councilmen are members and thereafter to be selected from other officers of such city.

(7) For any metropolitan municipal corporation which shall be authorized to perform the function of metropolitan water pollution abatement, two additional members who shall be commissioners of a sewer district or a water district which is operating a sewer system and is a component part of the metropolitan municipal corporation and shall participate only in those council actions which relate to the performance of the function of metropolitan water pollution abatement. The commissioners of all such sewer districts and water districts which are component parts of the metropolitan municipal corporation shall meet on the first Tuesday of the month following May 21, 1971 and thereafter on the second Tuesday of June of each even-numbered year at seven o'clock p.m. at the office of the board of county commissioners of the central county. After election of a chairman, nominations shall be made to select members to serve on the metropolitan council and successive ballots taken for each member until one candidate receives a majority of votes cast. The two members so selected shall not be from districts whose boundaries come within ten miles of each other.

(8) One member, who shall be chairman of the metropolitan council, selected by the other members of the council. The member shall not hold any public office of or be an employee of any component city or component county of the metropolitan municipal corporation.

## APPENDIX B
## CALCULATION OF DEVIATIONS

| Area | (A) 1989 Population | (B) County Council & Exec. | (C) Elec. City Rep's | (D) Total Votes | (E) Pop. Per Vote | (F) Deviation |
|---|---|---|---|---|---|---|
| Seattle | 497,200 | 3.438 | 10 | 13.438 | 37,000 | + 38.59% |
| Auburn | 32,460 | .224 | 1 | 1.224 | 26,520 | + 55.98% |
| Kent | 34,860 | .241 | 1 | 1.241 | 28,090 | + 53.38% |
| Redmond | 33,400 | .231 | 1 | 1.231 | 27,132 | + 54.97% |
| Renton | 38,460 | .266 | 1 | 1.266 | 30,379 | + 49.58% |
| Bellevue | 86,350 | .597 | 0 | .597 | 144,639 | − 140.07% |
| Federal Way | 58,000 | .401 | 0 | .401 | 144,638 | − 140.06% |
| Kirkland | 36,620 | .253 | 0 | .253 | 144,743 | − 140.24% |
| Mercer Island | 20,380 | .141 | 0 | .141 | 144,539 | − 139.90% |
| Sea–Tac | 24,000 | .166 | 0 | .166 | 144,578 | − 139.96% |
| 10–15K Cities | 36,110 | .250 | 0 | .250 | 144,440 | − 139.73% |
| 5–10K Cities | 20,140 | .139 | 0 | .139 | 144,892 | − 140.49% |
| <5K Cities | 25,590 | .177 | 0 | .177 | 144,576 | − 139.96% |

| Area | 1989 Population | County Council & Exec. | Elec. City Rep's | Total Votes | Pop. Per Vote | Deviation |
|---|---|---|---|---|---|---|
| Unincorporated | 502,430 | 3.475 | 0 | 3.475 | 144,584 | − 139.97% |
| Total King County Pop. | 1,446,000 | | | | | |

Notes

1. Maximum deviation = largest positive deviation + largest negative deviation. In this case, those are the deviations for Auburn (+55.98%) and the 5–10K Cities (−140.49%), respectively, resulting in a total maximum deviation of 196.47%.
2. Column (B) = 10 × ((A) / Total King County Population).
3. Column (D) = (B) + (C).
4. Column (E) = (A) / (D).
5. Column (F) = (60,250 − (E)) / 60,250.