# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-50655

United States Court of Appeals
Fifth Circuit

**FILED**

August 28, 2019

Lyle W. Cayce
Clerk

LEAGUE OF UNITED LATIN AMERICAN CITIZENS, (LULAC); MARIA MARTINEZ; JESSE ALANIZ, JR.; RAMIRO NAVA,

Plaintiffs–Appellants,

versus

EDWARDS AQUIFER AUTHORITY,

Defendant–Appellee,

CITY OF SAN MARCOS; CITY OF UVALDE; UVALDE COUNTY; NEW BRAUNFELS UTILITIES, also known as NBU; GUADALUPE-BLANCO RIVER AUTHORITY,

Intervenor Defendants–Appellees.

Appeal from the United States District Court
for the Western District of Texas

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The Edwards Aquifer Authority ("EAA") is a conservation and reclamation district established to regulate the groundwater of the Edwards Aquifer for the benefit of dependent users and species. The League of United Latin American Citizens and its Bexar County members Maria Martinez, Jesse

No. 18-50655

Alaniz, Jr., and Ramiro Nava (collectively, "LULAC") sued the EAA, asserting that its electoral scheme violated the "one person, one vote" principle of the Equal Protection Clause of the Fourteenth Amendment. Claiming to be a special-purpose unit of government, the EAA countered that it was exempt from such strictures. The district court granted summary judgment for the EAA, finding that its limited functions disproportionately impact those most empowered in its elections and that its apportionment scheme has a rational basis. We agree and affirm.

## I.

The Edwards Aquifer "is a unique underground system of water-bearing formations." *Barshop v. Medina Cty. Underground Water Conservation Dist.*, 925 S.W.2d 618, 623 (Tex. 1996). Water enters the aquifer as rainfall and surface water and exits through well-withdrawals and spring discharges. *Id.* As "the primary source of water for south central Texas," it is "vital to the residents, industry, and ecology of the region, the State's economy, and the public welfare." *Edwards Aquifer Auth. v. Chem. Lime, Ltd.*, 291 S.W.3d 392, 394 (Tex. 2009).

During the 1980s, overdrafting of the aquifer threatened various species that "rel[ied] upon adequate and continuous natural flows of fresh water . . . as an environment for their survival." *Sierra Club v. Lujan*, No. MO-91-CA-069, 1993 WL 151353, at *5 (W.D. Tex. Feb. 1, 1993). At the time, the Edwards Underground Water District ("EUWD") administered the aquifer. But it ultimately "lacked the regulatory authority the Legislature came to believe was essential." *Chem. Lime*, 291 S.W.3d at 394. Responding to successful litigation under the Endangered Species Act of 1973, the Texas legislature replaced the EUWD with the EAA in 1993, vesting it with "broad powers 'for the effective control of the resource to protect terrestrial and aquatic life, domestic and

2

No. 18-50655

municipal water supplies, the operation of existing industries, and the economic development of the state.'"[1]

Under the Edwards Aquifer Authority Act,[2] the EAA possesses "all of the powers, rights, and privileges necessary to manage, conserve, preserve, and protect the aquifer and to increase the recharge of, and prevent the waste or pollution of water in, the aquifer." Act § 1.08(a). Those powers include the ability to hire employees; enter contracts; issue grants or loans for water conservation and reuse; finance, construct, and operate dams and reservoirs; assert the power of eminent domain; and otherwise adopt and enforce rules necessary to execute its functions. *See id.* § 1.11.

The Act prohibits the withdrawal of aquifer water without a permit, limits the annual amount of permitted withdrawals, "and gives preference to 'existing user[s]' . . . who 'withdr[ew] and beneficially used underground water from the aquifer on or before June 1, 1993.'" *Chem. Lime*, 291 S.W.3d at 394–95 (quoting Act § 1.03(10)); *see also* Act §§ 1.14(c), 1.15. An existing user who submits "a declaration of historical use of underground water," pays an application fee, and "establishes by convincing evidence beneficial use of" aquifer

---

[1] *Chem. Lime*, 291 S.W.3d at 394 (citation omitted); *see also Barshop*, 925 S.W.2d at 624 ("The [EAA] supersedes the [EUWD], which previously possessed limited power to govern the aquifer.").

[2] Act of May 30, 1993, 73d Leg., R.S., ch. 626, 1993 Tex. Gen. Laws 2350, *amended by* Act of May 16, 1995, 74th Leg., R.S., ch. 524, 1995 Tex. Gen. Laws 3280; Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Gen. Laws 2505; Act of May 6, 1999, 76th Leg., R.S., ch. 163, 1999 Tex. Gen. Laws 634; Act of May 25, 2001, 77th Leg., R.S., ch. 1192, 2001 Tex. Gen. Laws 2696; Act of May 28, 2001, 77th Leg., R.S., ch. 966, §§ 2.60–2.62, 6.01–6.05, 2001 Tex. Gen. Laws 1991, 2021, 2075; Act of June 1, 2003, 78th Leg., R.S., ch. 1112, § 6.01(4), 2003 Tex. Gen. Laws 3188, 3193; Act of May 23, 2007, 80th Leg., R.S., ch. 510, 2007 Tex. Gen. Laws 900; Act of May 28, 2007, 80th Leg., R.S., ch. 1351, §§ 2.01–2.12, 2007 Tex. Gen. Laws 4612, 4627; Act of May 28, 2007, 80th Leg., R.S., ch. 1430, §§ 12.01–12.12, 2007 Tex. Gen. Laws 5848, 5901; Act of May 21, 2009, 81st Leg., R.S., ch. 1080, 2009 Tex. Gen. Laws 2818; Act of May 20, 2013, 83d Leg., R.S., ch. 783, 2013 Tex. Gen. Laws 1998 [hereinafter the "Act"].

water is entitled to a permit.[3] Subject to the annual cap on withdrawals, the EAA may grant "additional regular permits" after processing existing users' applications. Act § 1.18(a). Currently, there are fewer than two thousand active permit holders.

Permit holders "may not violate the terms or conditions of the permit" or use aquifer water outside the boundaries of the EAA. *Id.* §§ 1.34(a), 1.35(b). They must meter their water usage, avoid waste, and implement conservation plans approved by the EAA.[4] During a drought, the EAA may impose "utility pricing . . . to limit discretionary use by the customers of water utilities" and require further "reduction of nondiscretionary use by permitted or contractual users." Act § 1.26(a)(3)–(4).

The EAA has adopted rules to preserve the quality of water in the aquifer. Specifically, the EAA regulates the construction, operation, and maintenance of wells that draw from the aquifer or are drilled through it. *See* EAA Rules §§ 713.200–203. The rest of its regulations, however, are limited to the recharge[5] and contributing zones,[6] where pollutants are most likely to seep into the aquifer. Within those regions, the EAA mandates the reporting of noxious spills and regulates facilities housing toxic substances for commercial use. *Id.* §§ 713.400–401, 713.501. It further governs the storage of hazardous

---

[3] *Id.* § 1.16(b), (d). "Beneficial use" is defined broadly to mean "the use of the amount of water that is economically necessary for a purpose authorized by law, when reasonable intelligence and reasonable diligence are used in applying the water to that purpose." *Id.* § 1.03(4).

[4] *Id.* §§ 1.23, 1.31(a), 1.35(c); *see also* EDWARDS AQUIFER AUTHORITY, EDWARDS AQUIFER AUTHORITY RULES § 715.106 (2013) [hereinafter "EAA Rules"].

[5] The recharge zone refers to the area where caves, sinkholes, or other permeable features allow surface water to enter the aquifer, risking potential pollution. *See* EAA Rules § 702.1(162).

[6] The contributing zone encompasses the area "where runoff from precipitation flows downgradient to the recharge zone." *Id.* § 702.1(52).

substances in large aboveground and underground storage tanks in the recharge zone. *Id.* § 713.603. And it proscribes the use of coal tar-based pavement sealant products in the parts of Comal and Hays Counties that overlie the recharge and contributing zones. *Id.* § 713.703.

To ensure compliance with the Act and its regulations, EAA employees "may enter private or public property at any reasonable time," provided they "observe the establishment's rules concerning safety, internal security, and fire protection[;] . . . notify any occupant of their presence[;] and present proper identification." *Id.* § 717.104. If a violation has occurred, the EAA may suspend a permit, assess an administrative penalty, or sue for an injunction or civil penalty. Act §§ 1.36–1.38, 1.40.

The Act explicitly prohibits the EAA from levying a property tax to finance its operations. *Id.* § 1.28(a). With the approval of the state attorney general and the Texas Commission on Environmental Quality ("TCEQ"), however, the EAA may issue revenue bonds for the purchase of land or necessary equipment. *Id.* § 1.28(b)–(c). Moreover, it may "assess equitable aquifer management fees based on aquifer use." *Id.* § 1.29(b). Alternatively, other water districts located within its boundaries may contract with the EAA to pay its expenses through taxes collected from water users in those districts. *Id.* But in any case, the EAA may not charge "more than is reasonably necessary for [its] administration." *Id.*

The EAA's jurisdiction covers eight counties representing three distinct regions: (1) the western agricultural counties of Atascosa, Medina, and Uvalde, where approximately 117,000 persons dwell; (2) the eastern spring-flow counties of Caldwell, Comal, Guadalupe, and Hays, where roughly 435,000 people live; and (3) the urban county of Bexar, which has over 1.7 million residents. Initially, the Act provided that each region would appoint three members to

the EAA board of directors. *See* Act of May 30, 1993, 73d Leg., R.S., ch. 626, § 1.09, 1993 Tex. Gen. Laws 2350, 2356–57. But the Department of Justice ("DOJ") denied preclearance under § 5 of the Voting Rights Act of 1965 "due to the appointment method of selecting the board of directors." *Barshop*, 925 S.W.2d at 625. In consultation with the DOJ, the Texas legislature amended the Act in 1995 to establish a board of directors comprised of fifteen popularly elected members and two appointed non-voting members. Act § 1.09. Under the current scheme, the agricultural and spring-flow counties elect four directors each, whereas Bexar County elects seven directors. *Id.* § 1.093.

## II.

LULAC sued the EAA in 2012, claiming, *inter alia*, that its electoral system contravened the principle of "one person, one vote." Conceding that its electoral districts were malapportioned, the EAA rejoined that, as a special-purpose district, it was exempt from the "one person, one vote" requirement. The San Antonio Water System filed a complaint as plaintiff-intervenor, and the City of San Marcos, the City of Uvalde, Uvalde County, New Braunfels Utilities, and the Guadalupe-Blanco River Authority intervened as defendants. Both sides moved for summary judgment.

The district court denied LULAC's motion and granted summary judgment for the EAA, noting that its "power and authority [wa]s limited to carrying out its narrowly defined statutory purposes to manage, protect, preserve, and conserve the water in the aquifer." Given that the per capita usage of aquifer water was significantly higher in the agricultural and spring-flow counties than in Bexar County, the court explained that the EAA's activities disproportionately affected those most advantaged in its elections. It therefore held that, under *Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719 (1973), and *Ball v. James*, 451 U.S. 355 (1981), the EAA is not

No. 18-50655

subject to the strictures of "one person, one vote." Additionally, the court concluded that the apportionment scheme was rationally related to the EAA's statutory goals in balancing the competing interests of the three regions. LULAC appeals.

## III.

At the heart of democratic society is "[t]he right to vote freely for the candidate of one's choice." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). That right, however, "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* "[A]s a basic constitutional standard," legislative districts must "be apportioned on a population basis." *Id.* at 568; *see also Wesberry v. Sanders*, 376 U.S. 1, 8–9 (1964).

In *Avery v. Midland County*, 390 U.S. 474 (1968), the Court extended the principle of "one person, one vote" to the elections of local government officials. That case concerned the Midland County Commissioners Court, which possessed the authority to appoint minor officials; enter contracts; issue bonds; set the county tax rate; adopt a county budget; conduct elections; administer public welfare services; establish a public housing authority; fix school district boundaries; and construct and operate a courthouse, jail, hospital, airport, libraries, bridges, and roads. *Id.* at 476–77. Though recognizing that the Constitution is "not [a] roadblock[] in the path of innovation, experiment, and development among units of local government," the Court held that "units with general governmental powers over an entire geographic area [may] not be apportioned among single-member districts of substantially unequal population." *Id.* at 485–86. Because the Commissioners Court possessed "the authority to make a substantial number of decisions that affect all citizens," the Court determined that its elections must comply with the "one person, one vote"

7

No. 18-50655

requirement. *Id.* at 484. Nevertheless, the Court surmised the outcome might be different "[w]ere the Commissioners Court a special-purpose unit of government assigned the performance of functions affecting definable groups of constituents more than other constituents." *Id.* at 483–84.

The Court reached a similar conclusion in *Hadley v. Junior College District,* 397 U.S. 50 (1970). There, the plaintiffs claimed they had been denied an equal right to vote for junior college trustees, who were authorized to make employment decisions, form contracts, issue bonds, levy taxes and fees, supervise and discipline students, review petitions to annex school districts, condemn private property, "and in general manage the operations of the junior college." *Id.* at 53. The Court agreed. Although those powers were "not fully as broad as those of the" Commissioners Court, "the trustees perform[ed] important governmental functions" that were "general enough and ha[d] sufficient impact" to trigger the principle of "one person, one vote." *Id.* at 53–54. Yet once again, the Court acknowledged the possibility "that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with *Reynolds* . . . might not be required." *Id.* at 56.

Such a case arose in *Salyer.* At issue was the Tulare Lake Basin Water Storage District, which covered 193,000 acres of California farmland and contained only seventy-seven residents. *Salyer,* 410 U.S. at 723. Though "vested with some typical governmental powers"—including the ability to hire and fire employees, make contracts, issue bonds, condemn property, and cooperate with other agencies—the Tulare District "ha[d] relatively limited authority." *Id.* at 728 & n.7. "Its primary purpose, indeed the reason for its existence, [wa]s to provide for the acquisition, storage, and distribution of water for farming in

the Tulare Lake Basin." *Id.* at 728. Notably, the district "provide[d] no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." *Id.* at 728–29.

Equally importantly, "its actions disproportionately affect[ed] land-owners." *Id.* at 729. The entire cost of its operations was assessed against the land in proportion to the benefits received, and any delinquent payments became a lien on the land itself. *Id.* "In short, there [wa]s no way that the economic burdens of district operations c[ould] fall on residents qua residents . . . ." *Id.* Consequently, the Court held that the district was not subject to the strict requirements of *Reynolds*. *Id.* at 728. Instead, the Court found a rational basis for permitting only landowners to vote in the district's elections and for apportioning such votes according to the assessed valuation of the land.[7]

In *Ball*, 451 U.S. at 357, the Court confronted another water reclamation district that restricted the franchise to landowners and apportioned voting power based on the amount of land a voter owned. Unlike the relatively small Tulare District, however, the Salt River Project Agricultural Improvement and Power District covered nearly half the population of Arizona. *Id.* at 365. And whereas the operating costs of the Tulare District were assessed against the land, the Salt River District funded its activities through the sale of electric power and had become one of the largest electric providers in the state. *Id.* at 365–66. But those "distinctions d[id] not amount to a constitutional difference." *Id.* at 366.

After all, the Salt River District could not impose *ad valorem* property or

---

[7] *Salyer*, 410 U.S. at 730–31, 33–34. On the same day the Court decided *Salyer*, it upheld a similar scheme in *Associated Enterprises, Inc. v. Toltec Watershed Improvement District*, 410 U.S. 743 (1973) (per curiam).

sales taxes; enact laws governing the conduct of citizens; maintain streets or schools; or provide sanitation, health, or welfare services. *Id.* Furthermore, the district's water functions were "relatively narrow" because it "d[id] not own, sell, or buy water, nor d[id] [it] control the use of any water" once distributed. *Id.* at 367. Rather, it "simply store[d] water behind its dams, conserve[d] it from loss, and deliver[ed] it through project canals." *Id.* Moreover, "neither the existence nor size of the District's power business" was "constitutionally relevant" because "the provision of electricity is not a traditional element of governmental sovereignty" and, in any event, was "incidental" to the district's primary purpose of conserving and delivering water. *Id.* at 367–68.

As in *Salyer*, the Court also found that the Salt River District dispropor-tionately affected "the specific class of people whom the system ma[de] eligible to vote." *Id.* at 370. Only landowners committed capital to the district, and only they were subject to liens and acreage-based taxes. *Id.* Hence, the Court upheld the district's voting scheme "because it [bore] a reasonable relationship to its statutory objectives." *Id.* at 371.

The EAA does not contest that its electoral scheme dilutes the voting power of Bexar County residents. Instead, the parties dispute whether the *Salyer-Ball* exception extends to an electoral scheme that enfranchises all voters and, if so, whether the EAA satisfies the two prongs of the exception.

A.

LULAC maintains that the exception is limited to cases such as *Salyer* and *Ball* in which the franchise is restricted. LULAC reasons that where, as here, the franchise is open to all, LULAC contends that the electoral scheme must conform to the fundamental principle of "one person, one vote." To hold otherwise, LULAC insists, would be to invert the narrow exception for the gen-eral rule.

No. 18-50655

Nevertheless, both *Avery* and *Hadley* contemplated that the exception could apply to an election open to all. Although *Avery*, 390 U.S. at 483–84, involved an open-franchise election, the Court observed that if the Commissioners Court were a special-purpose district, it "would have to confront the question whether such a body may be apportioned in ways which give greater influence to the citizens most affected by the organization's functions." Similarly, in *Hadley*, 397 U.S. at 56, the Court remarked "that a *popular election* in compliance with *Reynolds* . . . might not be required" for officials "whose duties are so far removed from normal governmental activities and so disproportionately affect different groups." (Emphasis added.)

Relatedly, in *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 261–62 (1977), the Court upheld an electoral scheme for adopting a charter form of county government that enfranchised all voters but weighted the votes from city and county dwellers differently. In doing so, the Court analogized to *Salyer* and determined that the interests of city and county residents were sufficiently different to justify the disparity in voting strength. *Id.* at 266–69. Although *Lockport* is not directly on point,[8] it suggests that the exception enunciated in *Salyer* and *Ball* may apply to a general election.

LULAC rejoins that, in *Board of Estimate v. Morris*, 489 U.S. 688 (1989), the Court "did not purport to examine whether" the *Salyer-Ball* exception applied "most logically because . . . the franchise [there] was unrestricted." But

---

[8] Two features distinguished *Lockport* from *Salyer*. First, unlike the Tulare District in *Salyer*, the county government in *Lockport*, 430 U.S. at 260, possessed "general government powers." Second, whereas *Salyer* concerned the election of a board of directors, *Lockport* involved "a 'single-shot' referendum" in which "the expression of voter will [wa]s direct, and there [wa]s no need to assure that the voters' views w[ould] be adequately represented through their representatives in the legislature." *Id.* at 266. Hence, though *Salyer* was instructive, the Court explained that it "d[id] not resolve the issues in [*Lockport*]." *Id.* at 268.

11

that is a complete mischaracterization of *Morris*.  In holding that elections to the Board of Estimate of the City of New York must comport with the "one person, one vote" requirement, the Court never implied that the exception is relevant only in a limited-franchise context.  Instead, the Court performed the same analysis in *Salyer* and *Ball* to determine that the board was an entity of general governmental power.  Indeed, the Court emphasized that the board exercised "a significant range of functions common to municipal governments," including the authority to calculate property taxes, approve the city budget, and manage land use.  *Id.* at 694–95.  Such "'powers [we]re general enough and ha[d] sufficient impact throughout the district' to require that elections to the body comply with equal protection strictures."  *Id.* at 696 (quoting *Hadley*, 397 U.S. at 54).  Far from supporting LULAC's strained view of *Salyer* and *Ball*, *Morris* thus indicates that the exception may apply to a popular election of a local body of government.[9]

At least two circuits have so held.  In *Pittman v. Chicago Board of Education*, 64 F.3d 1098, 1101–03 (7th Cir. 1995), the court ruled that the elections of "local and specialized" school councils in Chicago were not subject to the "one person, one vote" requirement.  Importantly, the electoral scheme at issue granted the franchise to "all adult residents of the school's district," as well as to "all parents whether or not residents."[10]  Similarly, in *Education/Instruccion, Inc. v. Moore*, 503 F.2d 1187, 1188 (2d Cir. 1974) (per curiam), the court

---

[9] LULAC likewise misreads *Vander Linden v. Hodges*, 193 F.3d 268 (4th Cir. 1999).  That court concluded that South Carolina's county legislative delegations fell "within the scope of the one person, one vote mandate," given their array of "fiscal, regulatory, and appointive functions."  *Id.* at 277–78.

[10] *Pittman*, 64 F.3d at 1100.  *Cf. Baker v. Reg'l High Sch. Dist. No. 5*, 520 F.2d 799, 801–03 (2d Cir. 1975) (applying the special-purpose exception to the popular elections of regional school boards but ultimately finding that the boards engaged in "broad . . . governmental activity").

upheld a state statute establishing regional councils of government comprised of the chief elected official from each town. As the court explained, the councils mainly performed advisory and investigative tasks and thus "d[id] not have even the minimal governmental powers found insufficient to invoke the one man, one vote principle in . . . *Salyer*." *Id.* at 1189.

We therefore decline LULAC's invitation to cabin the *Salyer-Ball* exception to cases in which the franchise is restricted. LULAC claims that "[t]o read this exception any more broadly [would] divorce the rule from the unique factual moorings of *Salyer* and *Ball*" and would permit the rare exception to swallow the general requirement of "one person, one vote." But notably, the Court in those cases upheld an electoral system that not only weighted votes differently, but also denied the franchise entirely to certain voters. In contrast, all voters may participate in elections to the EAA board of directors, albeit with unequal voting power. Consequently, this case represents a narrower departure from the principle of "one person, one vote" than in *Salyer* or *Ball*.

## B.

Under the *Salyer-Ball* framework, we must first consider whether the EAA serves a "special limited purpose." *Salyer*, 410 U.S. at 728. Much like the water storage districts in those cases, the EAA exercises "some typical governmental powers." *Id.* at 728 & n.7; *see also Ball*, 451 U.S. at 366 n.11. For example, it may hire employees; enter contracts; administer grants or loans for water conservation and reuse; issue revenue bonds for the purchase of land or necessary equipment; design and operate dams and reservoirs; and condemn private property. *See* Act §§ 1.11, 1.28(b). Yet the EAA does not engage in any general governmental activities. It cannot levy *ad valorem* property or sales taxes or oversee such public functions as schools, housing, zoning, transportation, roads, or health and welfare services. *See Morris*, 489 U.S. at 694–96;

No. 18-50655

*Ball*, 451 U.S. at 366; *Salyer*, 410 U.S. at 728–29.  Rather, its powers are expressly tailored to protecting the quantity and quality of groundwater in the Edwards Aquifer and do not extend to any surface water or other aquifers located within its jurisdiction.[11]

As LULAC concedes, the EAA largely accomplishes its statutory purposes by regulating fewer than two thousand permit holders.  LULAC avers that, in issuing permits and imposing conditions thereon, the EAA not only "decid[es] who can access the groundwater" in the first instance, but also controls the use of the water once withdrawn.  But contrary to LULAC's depiction, the EAA's discretion to grant a permit is quite limited.  The Act itself caps the total amount of permitted withdrawals each year.  Act § 1.14(c).  Additionally, the Act "entitle[s]" an existing user to a permit upon filing a declaration of historical use, paying an application fee, and establishing a beneficial use for the water.[12]

Similar to the district in *Ball*, 451 U.S. at 367, the EAA "do[es] not own, sell, or buy water."  Rather, Texas landowners possess the groundwater in place beneath their property.  *Edwards Aquifer Auth. v. Day*, 369 S.W.3d 814, 838 (Tex. 2012).  Although the EAA may place certain conditions on permit holders, it does so only as necessary to fulfill its legislative mandate to conserve aquifer water.  For instance, the EAA requires permit holders to meter their water usage, avoid waste, implement conservation plans, and use aquifer water within the boundaries of the EAA.  Act §§ 1.23, 1.31(a), 1.34(a), 1.35(c).  It also proscribes landscape watering during daytime hours except "with a

---

[11] *See* Act § 1.08(b) ("The [EAA's] powers . . . apply only to underground water within or withdrawn from the aquifer.  This subsection is not intended to allow the [EAA] to regulate surface water.").

[12] *See Chem. Lime*, 291 S.W.3d at 395; *see also* Act § 1.16(d) (providing that the EAA "*shall* grant a[] . . . permit" if those conditions are met (emphasis added)).

14

hand-held hose or a soaker hose." EAA Rules § 715.126. And during a drought, the EAA may require permit holders to adopt utility pricing and to reduce even nondiscretionary uses of aquifer water. Act § 1.26(a)(3), (4). Such measures reasonably prohibit wasteful applications of a precious resource. But by no means does the EAA affirmatively mandate "the use to which the landowners who are entitled to the water choose to put it." *See Ball,* 451 U.S. at 367–68.

The EAA's obligation to prevent the pollution of the aquifer, however, is more characteristic of the powers exercised by a general governmental entity.[13] LULAC maintains that the EAA serves broad and significant purposes in protecting the health and sanitation of the region and in governing a natural resource "vital to the general economy and welfare of the State of Texas." *See Barshop*, 925 S.W.2d at 623. LULAC further contends that the EAA wields "expansive police powers" to "regulate every person in its jurisdiction directly" by conducting compliance investigations and initiating civil suits to enforce the Act.

That theory is unavailing. In *Ball*, 451 U.S. at 367–69 & n.12, the plaintiffs urged that the Salt River District's power operations and its authority over flood control "affect[ed] all residents within District boundaries and therefore represent[ed] the sort of important governmental function[s] that invoke[] the *Reynolds* one-person, one-vote doctrine." The Court disagreed. Because those functions "were stipulated to be incidental" to the district's "primary legislative purpose . . . to store, conserve, and deliver water," *id.* at 368–69, they did not "transform the District into an entity of general governmental power," *id.* at 370. Plainly put, "[n]othing in the *Avery*, *Hadley*, or *Salyer* cases suggests that . . . the breadth of economic effect of a venture undertaken by a

---

[13] *See Ball*, 451 U.S. at 366 (observing that the Salt River District did not oversee any sanitation services).

15

government entity as an incident of its narrow and primary governmental public function can, of its own weight, subject the entity to the one-person, one-vote requirements." *Id.* at 370.

As in *Ball*, the parties agree that the EAA's main function is to preserve the quantity of aquifer water by regulating permit holders. What's more, the EAA's powers are secondary to the plenary environmental authority of the TCEQ and subject to its supervision.[14] Hence, the EAA's regulation of pollutants does not render it a general governmental body because such conduct is incidental to its primary task of administering the permit process.

Indeed, aside from the construction and operation of aquifer wells, the EAA's regulation of water quality is confined to the recharge and contributing zones, which present the highest risk of water contamination. Within those specific zones, the EAA requires the reporting of toxic spills, EAA Rules § 713.401; prohibits the use of coal tar-based pavement sealant products, *id.* § 713.703; and regulates the storage of hazardous substances for commercial purposes, *id.* § 713.501, or in large aboveground and underground storage tanks, *id.* § 713.603. Such functions, however, are hardly "general enough [or] have sufficient impact throughout" the jurisdiction to warrant the strictures of "one person, one vote." *Hadley*, 397 U.S. at 54. That the EAA may conduct inspections and bring suit to enforce its regulations does not change the analysis. *See* Act §§ 1.37–1.38, 1.40; EAA Rules § 717.104. As the district court rightly noted, "[i]t would have been meaningless for the Legislature to create the EAA without giving it the tools it needs to carry out its duties and responsibilities."

---

[14] *See* TEX. WATER CODE ANN. § 5.013(a) (granting the TCEQ "general jurisdiction" over the issuance of water rights permits and pollution regulations, as well as "continuing supervision" over conservation districts—such as the EAA—that were created under article XVI, section 59 of the Texas Constitution).

No. 18-50655

The holding in *Kessler v. Grand Central District Management Association, Inc.*, 158 F.3d 92 (2d Cir. 1998), is thus instructive. *Kessler* involved the Grand Central Business Improvement District, which existed for the "limited purpose" of "promot[ing] business activity in the district." *Id.* at 94, 104. Its management association lacked the power to impose income or sales taxes, much less "to enact or enforce any laws governing the conduct of persons present in the district." *Id.* at 104. Though it performed some traditional governmental functions "in the area of security, sanitation, and social services," the court held that the district's manager was not subject to the "one person, one vote" requirement. *Id.* at 105. As the court reasoned, the manager's "responsibility for these functions [wa]s at most secondary to that of [New York] City," and its "activities in these areas [we]re quantitatively dwarfed by those of the City." *Id.* For example, "while the [management association] contribute[d] to the funding of a single outreach facility for homeless persons, the City ha[d] an entire [d]epartment devoted to assisting the homeless." *Id.* In much the same way, the EAA's conduct in regulating aquifer pollutants is limited and subservient to the general authority of the TCEQ.

Finally, LULAC complains that the EAA can "raise billions in revenue" through aquifer management fees, utility pricing regulation, and civil penalties. Although those "powers are not statutorily labeled as" a tax, LULAC posits that "the lack of any such label is legally insignificant." Invoking *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 564 (2012) [hereinafter *NFIB*], LULAC insists that the EAA's statutory powers share "the essential feature of any tax" in that they "produce[] at least some revenue for the Government."

That reasoning stretches *NFIB* to its breaking point. There, the Court held that the individual mandate of the Patient Protection and Affordable Care

17

No. 18-50655

Act of 2010 was functionally a tax despite its statutory label as a "penalty." *See NFIB*, 567 U.S. at 564, 574. In doing so, the Court noted that the "requirement to pay [wa]s found in the Internal Revenue Code and enforced by the IRS, which . . . must assess and collect it in the same manner as taxes."[15] The individual mandate did not impose a "prohibitory" financial burden, nor was the IRS permitted to collect payment by "means most suggestive of a punitive sanction, such as criminal prosecution." *Id.* at 566 (citation omitted). Because the refusal to buy health insurance incurred no other legal consequences, the Court thus concluded that "the individual mandate . . . need not be read" as a penalty. *Id.* at 567–68.

Conversely, aquifer management fees are not calculated or collected in the same way as is an income tax. Instead, such fees are "based on aquifer use" and may not exceed what "is reasonably necessary for the administration of the [EAA]." Act § 1.29(b). Although other water districts located within its boundaries may contract with the EAA to pay expenses "through taxes in lieu of user fees," *id.*, the EAA itself lacks the ability to tax, *id.* § 1.28(a). The same is true of its utility pricing regulation. Though the EAA may require water utilities to increase their pricing to limit discretionary use by their customers, it cannot collect higher fees directly from water users. *See id.* § 1.26(a)(3). And in any event, the EAA may engage in utility pricing regulation only during "critical period[s]" of drought. *Id.* § 1.26(a).

Additionally, should a violation of the Act occur, the EAA can suspend a permit, assess an administrative penalty, or sue for an injunction or civil penalty of up to $10,000 per day of a continuing infraction. *See id.* §§ 1.36–1.38,

---

[15] *NFIB.*, 567 U.S. at 563–64 (internal quotation marks and citation omitted) (noting that the shared responsibility payment "d[id] not apply to individuals who d[id] not pay federal income taxes" and, for those who owed the payment, "its amount [wa]s determined by such familiar factors as taxable income, number of dependents, and joint filing status").

No. 18-50655

1.40.  Unlike the individual mandate, those measures "attach[] negative" and "prohibitory" legal consequences to wrongful conduct and are explicitly designed to deter violations of Texas law.  *See NFIB*, 567 U.S. at 566, 568 (citation omitted).  Hence, the EAA has no taxing power or the functional equivalent thereof.  Rather, its authority is circumscribed to attain its narrowly defined purpose to conserve aquifer water.

## C.

We next ask whether the EAA's activities disproportionately impact the western agricultural and eastern spring-flow counties, whose residents are most empowered by its elections.  *See Ball*, 451 U.S. at 370; *Salyer*, 410 U.S. at 728.  The EAA's functions have a lopsided effect on those regions for at least four reasons.

First, per capita usage is significantly higher in those counties than in urban Bexar County.  Between 1992 and 1994—just before the adoption of the EAA's current electoral scheme—the average user in the western counties pumped three to eight times more water than did the average user in Bexar County.  Similarly, the average user in the eastern counties consumed twice as much as did the average user in Bexar County.  Aquifer usage has remained constant over the years.  Between 2010 and 2012, the western counties had a per capita usage that was roughly six to twelve times that of Bexar County, whereas the eastern counties averaged two times the per capita usage of Bexar County.  Such disparate usage shows that residents of the agricultural and spring-flow counties are more dependent upon the aquifer and thus are disproportionately affected by the EAA's regulation thereof.

Second, under Texas law, landowners enjoy "a constitutionally compensable interest in groundwater."  *Day*, 369 S.W.3d at 838.  Notably, property owners  in  the  agricultural  and  spring-flow  counties  collectively  possess

seventy-six percent of the land overlying the Edwards Aquifer. Consequently, they own an outsized share of aquifer water and are disproportionately impacted by the EAA's efforts to manage it.

Third, the EAA's regulation of water quality has little bearing on residents of Bexar County. Its rules relating to toxic spills and facilities storing large volumes of hazardous materials apply solely to the recharge and contributing zones. *See* EAA Rules §§ 713.401, 713.501. Yet only twenty-one percent of those regions fall within Bexar County. The EAA further regulates large aboveground and underground storage tanks in the recharge zone. *Id.* § 713.603. But only ten percent of that zone intersects Bexar County. Likewise, the ban on coal tar-based pavement sealant products applies exclusively in Comal and Hays Counties. *Id.* § 713.703. Hence, residents of the western and eastern counties disproportionately feel the weight of the EAA's regulatory power.

Fourth, one of the EAA's central purposes—and, indeed, the impetus for its creation—was the protection of endangered species. *See* Act § 1.14(a)(6)–(7). A disproportionate number of those species, however, reside in the eastern counties. Because that region lies downstream from the western and Bexar counties, resident human and animal populations are directly and adversely affected by reduced spring flow. The eastern counties and the wildlife they contain therefore rely most on the EAA's conservation efforts.

In response, LULAC highlights that Bexar County residents finance almost seventy-five percent of the EAA's operations through the payment of aquifer management fees. That is so largely because they purchase water at significantly higher rates than their rural counterparts. Whereas the statute caps fees at $2 per acre-foot of water *actually withdrawn* for agricultural use, municipal and industrial users pay $84 per acre-foot of water *authorized* to be

pumped. *See id.* § 1.29(e). LULAC thus maintains that Bexar County residents, "who have the *least* voting power within the EAA, are disproportionately burdened by the fees used to support it." According to LULAC, that "inverse relationship of burden and voting strength is the exact opposite of what" occurred in *Salyer* and *Ball*, where "the groups that were electorally advantaged . . . [also] bore the burden and reaped the benefit" of the districts' operations.

Yet LULAC overlooks that the burden of those costs does not fall directly on Bexar County residents. Instead, aquifer management fees are assessed to the San Antonio Water System which, as the permit holder, chooses to draw water from the aquifer and to pass on such expenses to the citizens of Bexar County. Such indirect effects are insufficient to subject the EAA to the "one person, one vote" requirement where residents in the eastern and western counties are directly and disproportionately impacted by its activities. The advantaged class of voters for a special-purpose district need not "be the only parties at all affected by the operations of the entity," nor must "their entire economic well-being . . . depend on that entity." *Ball*, 451 U.S. at 371. Instead, what matters is that "the effect of the entity's operations on them [i]s disproportionately greater than the effect on those" with diminished voting power. *Id.* Such is the case here.

LULAC yet emphasizes that the Act requires water utilities to raise their prices to limit discretionary use during a drought. *See* Act § 1.26(a)(3). LULAC therefore maintains that the passing along of operation costs from municipal permit holders to their customers is "not incidental or indirect" but "is expressly contemplated by the text of the . . . Act."

That claim is unpersuasive. In *Salyer*, 410 U.S. at 730, the Court similarly had "[n]o doubt" that "residents within the district may be affected by its activities." But it concluded that the "argument prove[d] too much." *Id.* The

21

No. 18-50655

Court explained, "Since assessments imposed by the district bec[a]me a cost of doing business for those who farm[ed] within it"—and that cost was ultimately passed along to consumers of the produce—"food shoppers in far away metropolitan areas [we]re to some extent likewise 'affected' by the activities of the district." *Id.* at 730–31. Nevertheless, "[c]onstitutional adjudication cannot rest on any such 'house that Jack built' foundation." *Id.* at 731. Notwithstanding the incidental effects that municipal water users may experience, the fact remains that the economic burden of the EAA's operations does not fall on Bexar County "residents qua residents." *Id.* at 729.

Lastly, LULAC advances that the EAA's efforts to conserve aquifer water and to protect endangered species benefit all residents, regardless of whether the water is used for agricultural irrigation, recreational springs, or human consumption. Citing *Hellebust v. Brownback*, 42 F.3d 1331, 1335 (10th Cir. 1994), LULAC urges that where "a state agency has the authority to affect every resident in matters arising in their daily lives, its powers are not disproportionate to those who vote for its officials." But *Hellebust* concerned the Kansas State Board of Agriculture, which possessed statewide jurisdiction to enforce approximately eighty laws governing the quality of meat and dairy products, the use of pesticides, and the right to divert and pump water. *Id.* at 1332–33, 1335. Conversely, the EAA does not exercise such omnibus and far-flung powers affecting all persons at all times.

## D.

Because the EAA therefore qualifies as a special-purpose district, we ask only whether the apportionment scheme "bears a reasonable relationship to its statutory objectives." *Ball*, 451 U.S. at 371. Rational-basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Heller v. Doe*, 509 U.S. 312, 319 (1993) (citation omitted). Instead, "[a] statute

is presumed constitutional, and [t]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it."[16]  Provided the law reasonably advances a legitimate state interest, we will sustain the statute "even if [it] seems unwise or works to the disadvantage of a particular group." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

The EAA's electoral scheme is rationally related to the legitimate goal of protecting the aquifer because it equitably balances the rival interests of the agricultural, spring-flow, and urban counties to ensure that no one region can dominate the aquifer's management.  Legislative history confirms that the legislature sought to achieve regional parity on the EAA board of directors.  For example, Representative Robert Puente stated that the board was "structured to . . . even out the three different interests" of the competing regions.  Debate on Tex. S.B. 1477 on the Floor of the House, 73d Leg., R.S. 84 (May 24, 1993).  Senator Kenneth Armbrister likewise remarked that the legislature "w[as] trying to provide a mechanism" that would prevent the board from being "skewed one way or the other."  Hearing on Tex. S.B. 1477 Before the Senate Comm. on Nat. Res., 73d Leg., R.S. 13 (May 6, 1993).  That concern persisted even when, in 1995, the legislature replaced the appointed nine-member board with an elected fifteen-member board.[17]

Additionally, the apportionment scheme was likely necessary to ensure the creation of the EAA.  In their declarations before the district court, both Puente and Armbrister reflected that the Act would not have passed if any one

---

[16] *Heller*, 509 U.S. at 320 (internal quotation marks and citations omitted); *see also Salyer*, 410 U.S. at 730 (considering whether the district's electoral scheme "was wholly irrelevant to achievement of the regulation's objectives" (internal quotation marks and citation omitted)).

[17] *See* Debate on Tex. H.B. 3189 on the Floor of the House, 74th Leg., R.S. 55 (May 9, 1995) ("Senate Bill 1477 was passed out with an appointed authority with roughly one third from each geographic region.  The bill before you still stays [true] to that compromise . . . .").

region controlled a majority of the directors or if the statute lacked the approval of all three regions.  LULAC does not contest that political reality but retorts that "legislators may not bargain away the constitutional voting rights of citizens . . . in order to get legislation passed."  Citing *Romer*, 517 U.S. at 634, and *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 446–47 (1985), LULAC contends that an apportionment scheme "predicated explicitly on favoring or disfavoring one political[ly] unpopular group or geographic region cannot survive even rational basis inquiry."

Nonetheless, courts have repeatedly found that a special-purpose district passes constitutional muster where its electoral scheme was reasonably necessary to the formation of the district.  *See, e.g.*, *Ball*, 451 U.S. at 371; *Salyer*, 410 U.S. at 731; *Kessler*, 158 F.3d at 108.  LULAC's reference to *Romer* and *Cleburne* is inapposite.  Unlike in those cases, there is no suggestion that the EAA's apportionment scheme rested on an "irrational prejudice" or "a bare . . . desire to harm a politically unpopular group."  *Cleburne*, 473 U.S. at 447, 450 (citation omitted); *see also Romer*, 517 U.S. at 634.  Consequently, the EAA's electoral system complies with the Equal Protection Clause of the Fourteenth Amendment.

AFFIRMED.

No. 18-50655

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

Lacking the requisite indicia of general governmental powers, the Aquifer Authority is plainly a single purpose entity, yet it is here urged that in choosing to select its directors by election than by appointment, the Texas Legislature stepped on the trip wire of one person one vote—an unnecessary mechanical reflex that would here undo the underpinnings—and virtues—of the single purpose doctrine.

The Aquifer Authority is charged with protecting an extraordinary asset of the state—one that can be depleted and lost to contamination and misallocation. The Legislature did not choose to create an appointive board. It rather chose to engage the three geographical areas with the greatest incentive to protect this unique resource, each with its own perspectives. These competing interests are defined by their proximity to the Aquifer—and distinct in their draw upon it. Its balancing allocation of members to the three distinct interests demands accommodation in the governance of the Aquifer Authority, spinning self-interest to the common objective of asset protection. It bears emphasis that this governance comes with no disenfranchisement of voters—only a dilution of voter strength essential to the very structure of the special purpose entity, a dilution essential to its core purpose. And to these eyes, dilution looks past the binary liability metric of impact attending disenfranchisement. The inquiry does not end with a finding of vote dilution. Here, dilution in service of preserving a common resource results not in disenfranchisement but in effective governance of the state's single purpose entity.